Filed 6/10/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CHILDREN'S HOSPITAL CENTRAL CALIFORNIA, | F065603 |
| Plaintiff and Respondent, | (Super. Ct. No. MCV048512) |
| v. | |
| BLUE CROSS OF CALIFORNIA et al., | **OPINION** |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Reed Smith, Margaret M. Grignon; Wilke Fleury Hoffelt Gould & Birney, Thomas G. Redmon, Curtis S. Leavitt, Daniel L. Baxter; Kennaday, Leavitt & Daponde and Curtis S. Leavitt for Defendants and Appellants.

Marion's Inn, Kennedy P. Richardson and Mark Palley for California Association of Health Plans as Amicus Curiae on behalf of Defendants and Appellants.

Hooper, Lundy & Bookman, Glenn E. Solomon and Lillie A. Werner for Plaintiff and Respondent.

DLA Piper, Stephen L. Goff, Todd M. Noonan; Jana Dubois for California Hospitals Association as Amicus Curiae on behalf of Plaintiff and Respondent.

-ooOoo-

This appeal concerns a dispute between respondent Children's Hospital Central California (Hospital), and appellants Blue Cross of California and Blue Cross of California Partnership Plan, Inc. (Blue Cross), over the reasonable value of the post-stabilization emergency medical services provided by Hospital to Medi-Cal beneficiaries enrolled in Blue Cross's Medi-Cal managed care plan. The services at issue were rendered during a 10-month period when Hospital and Blue Cross did not have a written contract that covered those beneficiaries.

Blue Cross paid Hospital approximately $4.2 million based on the Medi-Cal rates paid by the government. However, Hospital demanded its full billed charges of $10.8 million. The jury found there was an implied-in-fact contract between Hospital and Blue Cross and awarded Hospital approximately $6.6 million, the difference between the full billed charges and the $4.2 million Blue Cross had already paid.

Blue Cross contends the damages award was the result of erroneous discovery and evidence rulings that were predicated on the trial court's misconstruction of California Code of Regulations, title 28, section 1300.71, subdivision (a)(3)(B) (hereafter section 1300.71(a)(3)(B)). This regulation defines "Reimbursement of a Claim" for non-contracted providers as the payment of "the reasonable and customary value for the health care services rendered." (§ 1300.71(a)(3)(B).) This value is based on several factors. According to Blue Cross, the trial court incorrectly concluded that section 1300.71(a)(3)(B) provided the exclusive standard for determining the reasonable and customary value of the medical services in this action. Blue Cross is correct. Because of this error, the evidence of the reasonable and customary value was improperly limited to

2.

Hospital's full billed charges.  This error was prejudicial.  Accordingly, the case will be reversed and remanded for a retrial on damages.

## BACKGROUND

Hospital specializes in providing medical services to children.  Approximately 75 percent of Hospital's patients are in Medi-Cal programs. Hospital has a contract with the California Department of Health Care Services (DHCS), the responsible state agency, to render services to the majority of these Medi-Cal patients in the fee for service Medi-Cal plan.  Under this program, Hospital is paid the average California Medical Assistance Commission (CMAC) rate for the geographic region for the services it performs.

However, Hospital also serves Medi-Cal patients who are enrolled in a Medi-Cal managed care plan.  Unlike the fee for service plan, with a managed care plan the DHCS does not pay for services actually rendered.  Rather, the DHCS pays a fixed rate per person per month to the health plan, whether or not services are rendered.  (*Lackner v. Department of Health Services* (1994) 29 Cal.App.4th 1760, 1762, fn. 2.)  When services are rendered, the health plan pays the provider.

Blue Cross contracts with the DHCS to provide a Medi-Cal managed care plan.  Accordingly, the DHCS pays Blue Cross a negotiated rate per month per beneficiary enrolled in Blue Cross's plan.  In turn, Blue Cross manages that beneficiary's health care service needs.  This management includes entering into contracts with various health care providers.

Up until July 2007, Hospital and Blue Cross had a written contract setting rates for inpatient and outpatient medical services provided to Blue Cross Medi-Cal beneficiaries.  However, after that contract expired on July 31, 2007, the parties were unable to agree on the contract terms.  Eventually, the parties entered into a new contract effective June 1, 2008.  Accordingly, there was a 10-month period during which Hospital and Blue Cross had no written contract.

3.

During this off-contract period, Hospital was required to provide emergency services to Blue Cross Medi-Cal beneficiaries under federal and state law. A hospital with an emergency department must provide a patient with "an appropriate medical screening examination" and "such treatment as may be required to stabilize" any emergency medical condition without regard to the patient's insurance or ability to pay. (42 U.S.C. § 1395dd(a), (b); Health & Saf. Code, § 1317.) Further, a hospital generally may not transfer or discharge a patient until it has been determined that the emergency medical condition has been stabilized. (42 U.S.C § 1395dd(c) and (e)(3); Health & Saf. Code, §§ 1317.1, subd. (j) and 1317.2.)

Blue Cross, as a Medi-Cal managed care organization, had a corresponding obligation to pay for emergency services rendered to the Medi-Cal beneficiaries enrolled in its plan during the off-contract period. (42 U.S.C § 1396u-2(b)(2)(A); Health & Saf. Code, § 1371.4; *Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 504 (*Prospect*).) This obligation continued until such time as the enrollees could be transferred to a contracted provider or discharged. (Welf. & Inst. Code, § 14454, subd. (a).) Hospital, as the provider of those emergency services without a contract with Blue Cross, was required to accept as payment in full the amount the DHCS would have paid directly for emergency services under the Medi-Cal fee for service system, i.e., the average CMAC rate. (42 U.S.C. § 1396u-2(b)(2)(D.)

However, once the treating provider has determined that the emergency medical condition has been stabilized, a Medi-Cal managed care organization's obligation to pay for emergency services ends and the organization "may require prior authorization as a prerequisite for payment for necessary" post-stabilization medical care. (Health & Saf. Code, § 1371.4, subd. (c).) "[I]f the hospital emergency department or emergency physician fails to obtain prior authorization," the managed care organization "may deny reimbursement." (Cal. Code Regs., tit. 22, § 53855, subd. (a).) But, upon receipt of a request from an out of contract hospital for authorization for post-stabilization medical

4.

care, the Medi-Cal managed care organization must render a decision within 30 minutes, or "the request shall be deemed to be approved." (*Ibid.*)

Here, during the off-contract period, 896 Blue Cross Medi-Cal beneficiaries received emergency care at Hospital followed by post-stabilization inpatient medical services. Blue Cross paid Hospital for the emergency medical care at the average CMAC rate as required by statute. These payments are not in dispute.

Hospital also submitted claims to Blue Cross for the post-stabilization services provided to the 896 Blue Cross Medi-Cal beneficiaries. Blue Cross paid those claims at the average CMAC rate of $1,275 per day. When in October 2008, the DHCS established a new CMAC rate of $1,779 per day retroactive to services rendered on or after January 1, 2007, Blue Cross made an additional payment to Hospital covering the difference. In total, Blue Cross paid $4,211,958 to Hospital for post-stabilization services provided to Blue Cross Medi-Cal beneficiaries during the off-contract period.

Hospital filed this action in July 2009 seeking additional payments from Blue Cross. Hospital alleged that: it had provided emergency and post-stabilization medical services to Blue Cross Medi-Cal beneficiaries during the off-contract period; it had timely requested pre-authorization from Blue Cross to provide post-stabilization services to these beneficiaries; and Blue Cross had failed to either appropriately respond or arrange for the patients' transfer, or had approved the requests. Hospital further alleged that, by its actions, Blue Cross had impliedly agreed to pay the reasonable and customary value for all the post-stabilization services provided to its Medi-Cal beneficiaries.

In alleging that it was entitled to the reasonable and customary value for these post-stabilization services, Hospital relied on section 1300.71(a)(3)(B). This regulation provides that, for non-contracted providers, the reimbursement of a claim means

> "the payment of the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the

5.

services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case .…"  (§ 1300.71(a)(3)(B).)

According to Hospital, this reasonable and customary value is the total amount of the charges it billed Blue Cross.  Blue Cross denied Hospital's allegations.

Hospital maintains a uniform schedule of the charges it bills for all procedures, services, and goods provided to patients.  This schedule is known as a "charge master."  Hospital's charge masters for 2007 and 2008 included more than 16,000 line items.

The charge master is filed annually with the State of California and is available to the public.  Hospital uses its charge master to create summary and itemized bills for each patient who receives services.  The charges are the same for every patient.  Nevertheless, in 2007 and 2008, less than five percent of the payors paid Hospital the full billed charges.

Hospital updates its charge master and increases its prices each year.  In determining the percentage price increase for all of the line items, Hospital looks at a variety of global factors, including its overall cost structure, financial position, and contracts.  Hospital does not examine each line item individually.  Rather, Hospital periodically "spot checks" certain items and compares those prices to the prices being charged by peer hospitals.

In early discovery, Blue Cross propounded requests for admissions to Hospital.  Blue Cross asked Hospital to admit that, during the off-contract period, every written contract between Hospital and a health insurer or health plan provided that Hospital would accept less than its full billed charges as payment for post-stabilization services and that Hospital had no written contract that provided it would receive its full billed charges for such services.  Hospital objected to these requests on the ground that

6.

contracted rates were irrelevant for the determination of reasonable and customary value under section 1300.71(a)(3)(B).

Thereafter, in a set of special interrogatories, Blue Cross asked Hospital to provide both the number of patients in 2007 and 2008 receiving post-stabilization care for whom Hospital received its full billed charges as payment and the name of any non-contracted Medi-Cal managed care organization that paid Hospital's full billed charges for post-stabilization services. Hospital objected to these interrogatories on the ground that actual payments were irrelevant to the reasonable and customary value of the post-stabilization services.

Blue Cross moved to compel responses to the above discovery requests. The trial court denied Blue Cross's motions on the ground that the evidence sought was irrelevant. The court concluded that "'fees usually charged,'" one of the section 1300.71(a)(3)(B) factors, "does not mean payments accepted."

Hospital filed several motions in limine regarding the scope of the evidence that Blue Cross would be permitted to present at trial on the reasonable value of the post-stabilization services rendered to the Medi-Cal beneficiaries. Hospital first sought an order confirming that the "six-factor test" set forth in section 1300.71(a)(3)(B) was the applicable standard for calculating the reasonable and customary value for the post-stabilization medical care it provided. Hospital then requested the trial court to preclude Blue Cross from introducing evidence of: the rates accepted by or paid to Hospital by other payors; the Medi-Cal and Medicare fee for service rates paid by the government; and Hospital's service specific costs. Hospital additionally sought to exclude testimony from Blue Cross's retained expert, Henry Miller, on the ground that Miller did not consider or use the six-factor test in reaching his opinion on the reasonable and customary value of the services at issue. Rather, Miller opined that the Medi-Cal fee for service rate in place during the non-contracted period was the reasonable and customary rate that should be paid by Blue Cross for services provided to its Medi-Cal beneficiaries.

The trial court granted these motions. The court confirmed that section 1300.71(a)(3)(B) was the exclusive standard for calculating the reasonable and customary rate that Blue Cross had to pay Hospital for the post-stabilization services. The court then applied this standard and excluded "any evidence, argument, or comment that the rates accepted or paid by other payors are reasonable and customary or otherwise limit what Blue Cross must pay to" Hospital. Similarly, the court excluded "argument that rates paid by the government are reasonable and customary or otherwise limit the amount Blue Cross must pay" Hospital. The court also excluded any evidence of cost information as a basis to set reasonable and customary charges finding that cost was not part of the six-factor test and that it did not relate to value. Regarding Miller's expert testimony, the trial court deferred its ruling pending an Evidence Code section 402 hearing to determine whether Miller's opinion was based on the six-factor test.

At trial, Hospital supported its damages claim by presenting the amount of its full billed charges and applying the section 1300.71(a)(3)(B) six-factor test to those charges. Hospital's Chief Financial Officer, Michelle Waldron, testified regarding Hospital's qualifications, training, and experience; the nature of the services rendered; the charges themselves; the market limitations on the yearly increase in charges; and the economics of operating Hospital, noting that the payments for the 75 percent of Hospital's patients who are Medi-Cal beneficiaries do not cover Hospital's overall costs of providing services to those beneficiaries. Hospital's expert witness, Michael Heil, testified that, when compared to other comparable hospitals, Hospital's charges were generally in the midrange or below. Thus, the hospital argued its full billed charges represented the reasonable and customary value of the services provided. However, for all hospitals, the billed charges are the highest amounts that are ever received for the services.

The jury was instructed on damages based on section 1300.71(a)(3)(B). The jury was first told:

"If you find that Blue Cross authorized or is deemed to have authorized Children's Hospital to provide post-stabilization care services to the Blue Cross Medi-Cal members at issue, Blue Cross was required to pay Children's Hospital the reasonable and customary value of those services. That the value might be reflected by the bill submitted by Children's Hospital, or the amount Blue Cross paid, or some amount lesser than, greater than, or in between those amounts."

The jury was then instructed that, if it found the post-stabilization care was authorized, Blue Cross was required to pay Hospital the "reasonable and customary value for the services rendered" taking into consideration the section 1300.71(a)(3)(B) factors. However, in accordance with the trial court's pretrial evidence rulings, the jury was cautioned that "[r]ates accepted by Children's Hospital or paid to Children's Hospital may not be considered when determining the reasonable and customary value of services provided" and that "[r]ates paid by the government may not be considered in calculating the reasonable and customary value of services that are the subject of this lawsuit."

The jury found that Hospital provided notice to Blue Cross and received authorization to provide post-stabilization care to the 896 patients at issue. The jury further concluded that the parties entered into an implied-in-fact contract, Blue Cross breached the contract, and Hospital was harmed by the breach. The jury awarded Hospital damages of $6,615,502, the amount of Hospital's full billed charges less the amount that Blue Cross had already paid.

Judgment was entered for Hospital in the principal sum of $6,615,502 plus prejudgment interest of $4,138,815.30.

## DISCUSSION

**1.** *Section 1300.71(a)(3)(B) does not provide the exclusive standard for valuing the post-stabilization services provided by Hospital.*

*a. The Knox-Keene Act.*

The Blue Cross Medi-Cal plan at issue is a health care service plan. As such, it is governed by the comprehensive system of licensing and regulation known as the Knox-

9.

Keene Health Care Service Plan Act of 1975 (Knox-Keene Act). (Health & Saf. Code, § 1340 et seq.; *Prospect, supra,* 45 Cal.4th at p. 504.)

The Knox-Keene Act requires for-profit health care service plans to promptly reimburse emergency health care providers for both emergency medical services and authorized post-stabilization emergency medical services. If the claim is uncontested, the reimbursement must be "as soon as practical, but no later than 30 working days after receipt of the complete claim .…" (Health & Saf. Code, § 1371.35, subd. (a); *Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 215 (*Bell*).)

The Department of Managed Health Care (DMHC) is charged with the administration and enforcement of the laws relating to health care service plans. (Health & Saf. Code, § 1341.) To carry out its duties, the DMHC is authorized to promulgate regulations. (Health & Saf. Code, § 1344.)

### b. The DMHC's adoption of section 1300.71.

Section 1300.71 is titled "Claims Settlement Practices." This regulation is authorized by Health and Safety Code sections 1371 and 1371.35. These statutes impose procedural requirements on claim processing and subject health care service plans to disciplinary action and penalties for failure to timely comply with those requirements. (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 163.)

The DMHC explained in its initial statement of reasons that section 1300.71 was "necessary to clearly define terms relating to claim settlement and reimbursement, and provide procedures for plans and providers to prevent unreasonable delays in payment of provider claims." Further, the DMHC wanted to clarify "the meaning of unfair payment practices and the term 'complete and accurate claim.'"

As outlined above, section 1300.71(a)(3)(B) defines "'Reimbursement of a Claim'" for non-contracted providers. Such reimbursement means "the payment of the reasonable and customary value for the health care services rendered." The reasonable

and customary value is to be "based upon statistically credible information that is updated at least annually" and takes six factors into consideration. These factors are: "(i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case." (§ 1300.71(a)(3)(B).)

In defining "reasonable and customary value," the DMHC incorporated language from *Gould v. Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1059 (*Gould*). In that case, Dr. Gould, a psychiatrist in West Los Angeles, treated employees who had sustained industrial psychiatric injuries during their employment as police officers. Dr. Gould submitted bills for his services that exceeded the medical fee schedule adopted by the Division of Workers' Compensation. The Workers' Compensation Appeals Board (WCAB) found in favor of the employer ruling that the official medical fee schedule should be used "'[i]n the absence of a showing of extraordinary factors justifying higher fees.'" (*Gould, supra,* 4 Cal.App.4th at p. 1064.)

The Court of Appeal annulled the WCAB decisions. The court concluded the WCAB had applied an incorrect burden of proof in deciding whether Dr. Gould was entitled to fees in excess of the schedule. The court remanded the matter for a determination of whether Dr. Gould's fees for the psychotherapy sessions were reasonable. The court stated that, in deciding whether fees in excess of the schedule are reasonable, "the WCAB *may* consider evidence regarding the medical provider's training, qualifications, and length of time in practice; the nature of the services provided; the fees usually charged by the medical provider; the fees usually charged in the general geographical area in which the services were rendered; other aspects of the economics of the medical provider's practice that are relevant; and any unusual circumstances in the case." (*Gould, supra,* 4 Cal.App.4th at p. 1071, italics added, fn. omitted.)

The DMHC solicited public comments four times in connection with the adoption of section 1300.71. In both its responses to the comments and its final statement of reasons, the DMHC emphasized that the definition of what constitutes reimbursement of a claim in section 1300.71, subdivision (a)(3) was not intended to alter or change existing California law.[1]

In responding to comments, the DMHC refused to specifically set reimbursement amounts. For example, the DMHC rejected suggestions that non-contracted providers should either be reimbursed at 100 percent of their billed charges or be reimbursed based on Medicare or Medicaid fee schedules. Rather, the DMHC explained that California law requires payors to reimburse non-contracted providers based upon the reasonable and customary value of the services rendered. The DMHC observed that a provider's usual charges are not determinative of the fair and reasonable value and that government programs are not designed to reimburse the provider for the fair and reasonable value of the services.

The DMHC further noted that the "regulations are intended to set forth the *minimum* payment criteria to ensure compliance with the [Knox-Keene] Act's claims payment and dispute resolution standards" (italics added)*,* and that, to the extent providers wish to pursue other common law or statutory remedies, they may seek redress in the courts. According to the DMHC, this regulation accurately reflects California law and incorporates the concept of quantum meruit.

---

[1]    Blue Cross's request that this court take judicial notice of the DMHC's responses to comments for the four comment periods is granted. We further grant the requests from Amicus Curiae California Association of Health Plans and Amicus Curiae California Hospital Association to judicially notice the DMHC's final statement of reasons for adopting section 1300.71. Amicus Curiae California Hospital Associations remaining requests for judicial notice are also granted. Hospital's request that this court judicially notice four documents pertaining to the membership of the California Association of Health Plans is denied as irrelevant.

In the final statement of reasons for section 1300.71, the DMHC explained that the intent was to establish a methodology for determining the reasonable value of health care services by non-contracted providers but that the criteria specified do not dictate a specific payment rate. Rather, the payor is required to calculate the appropriate reimbursement based on statistically credible information that takes the *Gould* factors into consideration. If a payor fulfills its claims payment obligation using these criteria, the DMHC will consider the payor compliant with Health and Safety Code sections 1371 and 1371.35, i.e., the reimbursement of the claim will be deemed timely. "However, the definition is not a substitute for traditional forums for contract dispute resolution. If a provider disputes the payor's calculation of the fair and reasonable value of the health care services he has rendered, the provider is free to seek resolution of that dispute in a court of law or through any other available civil remedy."

In sum, in adopting section 1300.71(a)(3)(B), the DMHC established the minimum criteria for reimbursement of a claim, not the exclusive criteria. The DMHC refused to set specific amounts noting that neither billed charges nor government rates are determinative of the reasonable value of the medical services. Rather, the DMHC intended that reasonable value be based on the concept of quantum meruit and that value disputes be resolved by the courts. In fact, the DMHC has acknowledged that, unlike the courts, it "'lacks the authority to set specific reimbursement rates under theories of *quantum meruit* and the jurisdiction to enforce a reimbursement determination on both the provider and the health plan.'" (*Bell, supra,* 131 Cal.App.4th at p. 218.)

*c. The section 1300.71(a)(3)(B) factors are not the exclusive measure of value.*

As recognized by the DMHC, section 1300.71(a)(3)(B)'s directive to pay non-contracted providers the reasonable and customary value of their services embodies the concept of quantum meruit. "Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.'" (*Huskinson & Brown v. Wolf* (2004) 32

13.

Cal.4th 453, 458.)  The measure of recovery in quantum meruit is the reasonable value of the services, provided they were of direct benefit to the defendant.  (*Palmer v. Gregg* (1967) 65 Cal.2d 657, 660.)  The burden is on the person making the quantum meruit claim to show the value of the services.  (*Miller v. Campbell, Warburton, Fitzsimmons, Smith, Mendel & Pastore* (2008) 162 Cal.App.4th 1331, 1344.)

The "reasonable value" of the services has been described as the "going rate" for the services (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 446) or the "reasonable market value at the current market prices" (*Punton v. Sapp Bros. Construction Co.* (1956) 143 Cal.App.2d 696, 701).  Reasonable market value, or fair market value, is the price that "'a willing buyer would pay to a willing seller, neither being under compulsion to buy or sell, and both having full knowledge of all pertinent facts.'"  (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1174-1175, fn. 9.)

In determining value in quantum meruit cases, courts accept a wide variety of evidence.  For example, the party suing for compensation may testify as to the value of his services or offer expert testimony.  However, such evidence is not required and is not binding on the trier of fact.  (*Culver Adjustment Bureau v. Hawkins Constr. Co.* (1963) 217 Cal.App.2d 143, 145.)   Evidence of value can also be shown through agreements to pay and accept a particular price.  (*Oliver v. Campbell* (1954) 43 Cal.2d 298, 305; *Watson v. Wood Dimension, Inc.* (1989) 209 Cal.App.3d 1359, 1365 (*Watson*).)  "The court may consider the price agreed upon by the parties 'as a criterion in ascertaining the reasonable value of services performed.'"  (*Watson, supra,* 209 Cal.App.3d at p. 1365.)  Accordingly, in an action for the reasonable value of services, a written contract providing for an agreed price is admissible in evidence.  (*Parker v. Maier Brewing Co.* (1960) 180 Cal.App.2d 630, 635.)  Additionally, evidence of a professional's customary charges and earnings is relevant and admissible to demonstrate the value of the services rendered.  (*Citron v. Fields* (1938) 30 Cal.App.2d 51, 61.)

As can be seen from the above examples, the facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at issue, i.e., the price that would be agreed upon by a willing buyer and a willing seller negotiating at arm's length. Specific criteria might or might not be appropriate for a given set of facts.

Thus, while the *Gould* court set forth a comprehensive set of factors for the situation presented there, those factors are not exclusive or necessarily appropriate in all cases. In *Gould*, the service provider, a psychiatrist, was attempting to demonstrate that fees exceeding the workers' compensation medical fee schedule were reasonable. In that situation, evidence of the fees Gould usually charged, and presumably was paid, and the fees charged by other providers in the same geographical region was relevant to demonstrate those fees were in fact reasonable for that market.

In contrast here, Hospital was required to demonstrate the reasonable value, i.e., market value, of the post-stabilization care it provided. This market value is not ascertainable from Hospital's full billed charges alone. "[A] medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value." (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 564.) Rather, the full billed charges reflect what the provider unilaterally says what its services are worth. In a given case, the reasonable and customary amount that the health care service plan has a duty to pay "might be the bill the [medical provider] submits, or the amount the [health care service plan] chooses to pay, or some amount in between." (*Prospect, supra,* 45 Cal.4th at p. 505.)

Accordingly, although Hospital's full billed charges were relevant to the issue of the reasonable and customary value of the services, they were not determinative. Analogizing this situation to other quantum meruit cases, relevant evidence would include the full range of fees that Hospital both charges and accepts as payment for similar services. The scope of the rates accepted by or paid to Hospital by other payors

15.

indicates the value of the services in the marketplace. From that evidence, along with evidence of any other factors that are relevant to the situation, the trier of fact can determine the reasonable value of the particular services that were provided, i.e., the price that a willing buyer will pay and a willing seller will accept in an arm's length transaction.

Therefore, the trial court erred in ruling that section 1300.71(a)(3)(B) provided the exclusive standard for determining the reasonable value of the post-stabilization services. The DMHC neither intended nor had the power to dictate payment rates or change California law on quantum meruit. Rather, as the DMHC explained, in adopting section 1300.71 it was setting the minimum claims payment and dispute resolution standards to ensure compliance with the Knox-Keene Act's time requirements for claims reimbursement.

Alternatively, Blue Cross argues the trial court erred when it narrowly construed section 1300.71(a)(3)(B) to preclude the admission of relevant evidence. By excluding evidence of the rates accepted by or paid to Hospital by other payors as being irrelevant, the trial court limited the evidence regarding two of the *Gould* factors, i.e., the fees usually charged by the provider and the prevailing provider rates charged in the same general geographic area, to Hospital's full billed charges. According to Blue Cross, "charges" should be interpreted to include the full range of fees that the provider accepts as payment in full for its services. However, there is no need to resolve this issue. While the *Gould* factors may provide some guidance in analyzing the reasonable value of the services rendered in certain circumstances, they are not the exclusive measure of value. Those factors alone do not determine reasonable value. Rather, under settled quantum meruit principles, relevant evidence of the reasonable/market value of the services provided includes the full range of fees that Hospital both charges and accepts as payment.

**2.**     *The trial court's use of an incorrect value standard led to legal errors.*

*a. Discovery rulings.*

The trial court denied two motions filed by Blue Cross to compel discovery of Hospital's agreements with others regarding payments for post-stabilization services. The trial court ruled that evidence of fees accepted by Hospital for post-stabilization care was irrelevant to determining the reasonable value of those services under section 1300.71(a)(3)(B).

The scope of permissible discovery is very broad. (*Dodd v. Cruz* (2014) 223 Cal.App.4th 933, 939.) "[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action … if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2017.010.) For discovery purposes, information is relevant if it might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement. Admissibility is *not* the test. Rather, it is sufficient if the information sought might reasonably lead to other, admissible evidence. (*Glenfed Development Corp. v. Superior Court* (1997) 53 Cal.App.4th 1113, 1117.)

Discovery rulings are generally reviewed for abuse of discretion. Nevertheless, where a discovery motion is denied on relevancy grounds based on an erroneous analysis of the substantive law governing the case, the appeal may raise a pure question of law. (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 970.)

As discussed above, evidence regarding the range of fees that Hospital accepts for post-stabilization care is relevant to the reasonable value of those services. The trial court incorrectly concluded otherwise and denied discovery on that ground. Thus, the trial court erred in denying Blue Cross's motions to compel discovery.

Hospital argues that evidence of its contract rates with other health insurance plans is not discoverable because it would disclose proprietary financial information and trade

17.

secrets.  However, Hospital's concerns can be handled through appropriate protective orders.  (E.g., Code Civ. Proc., §§ 2030.090, 2031.060, 2033.080.)

### b. Motions in limine.

The trial court granted Hospital's motions in limine to exclude evidence of: the rates accepted by or paid to Hospital by other payors; the Medi-Cal and Medicare fee for service rates paid by the government; and Hospital's service specific costs.  The court concluded this evidence was not admissible under the section 1300.71(a)(3)(B) six-factor test.

A trial court's ruling on an in limine motion is generally reviewed for abuse of discretion.  However, review is de novo when the issue is one of law.  (*Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1392.)

As discussed above, the trial court erred when it ruled that section 1300.71(a)(3)(B) provided the exclusive standard of value and, based on that ruling, precluded evidence of the various rates Hospital charges and accepts as payment. Reasonable value is market value, i.e., what Hospital normally receives for the services it provides from the relevant community.  Hospital rarely receives payment based on its published charge master rates.  Thus, in determining the reasonable value of the post-stabilization services, the full range of fees is relevant.  The scope of the rates accepted by or paid to Hospital by other payors indicates the value of those services in the marketplace.

Therefore, the trial court erred in granting Hospital's motion to exclude evidence of the rates accepted by or paid to Hospital by other payors.  All rates that are the result of contract or negotiation, including rates paid by government payors, are relevant to the determination of reasonable value.  In other words, applying quantum meruit principles, rates are relevant if they reflect a willing buyer and a willing seller negotiating at arm's length.

18.

However, under quantum meruit, the costs of the services provided are not relevant to a determination of reasonable value. Quantum meruit measures the value of services to the recipient, not the costs to the provider. (See *Iraola & CIA., S.A. v. Kimberly-Clark Corp.* (11th Cir. 2003) 325 F.3d 1274, 1282.)

Accordingly, in the analogous situation of determining the reasonable fee for an attorney's services, the courts have rejected a "cost-plus" approach finding that basing the fee on costs is neither appropriate nor practical. (*Shaffer v. Superior Court* (1995) 33 Cal.App.4th 993, 1002-1003.) "Costs—high or low—can be subjective and if deemed relevant to value might reward inefficiency and greed." (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 641.)

Similarly here, the reasonable and practical way to value the post-stabilization services provided by Hospital is to analyze what is being paid and accepted in the market. Parsing the costs for each service would be impractical. As pointed out by Hospital, a cost-based system "would undermine efficiency and reward waste." Thus, although the trial court excluded evidence of Hospital's service specific costs for the wrong reason, the result was correct.

### c. Jury instructions.

The trial court correctly instructed the jury that Blue Cross was required to pay Hospital the reasonable and customary value of the post-stabilization services and that this value might be reflected by the bill submitted by Hospital, or the amount Blue Cross paid, or some amount lesser than, greater than, or in between those amounts. However, the trial court also instructed the jury that it was to determine this reasonable and customary value based on the six factors enumerated in section 1300.71(a)(3)(B). Contrary to this instruction, section 1300.71(a)(3)(B) does not provide the exclusive measure of value.

Further, the trial court limited the evidence by instructing the jury that it could not consider any evidence of the "[r]ates accepted by [Hospital] or paid to [Hospital]" or the

19.

"[r]ates paid by the government." The jury was also cautioned that, in awarding damages, it must not "speculate or guess." Accordingly, based on the trial court's instructions, the only evidence of value the jury could consider was Hospital's full billed charges. This was error.

### d. Blue Cross's expert's testimony.

The trial court limited the testimony from Miller, Blue Cross's expert, to opinions based on the six-factor test. This ruling was also error. As discussed above, the six-factor test is not exclusive. Accordingly, Miller's testimony should not have been limited in this manner.

Contrary to Hospital's argument, Blue Cross did not waive or invite this error when it failed to request an Evidence Code section 402 hearing. The trial court offered to hold a Evidence Code section 402 hearing to determine whether Miller's opinion was based on the six-factor test. However, the trial court erred as a matter of law on the foundation of its ruling on Miller's testimony when it concluded that the six-factor test was the exclusive measure of value. Blue Cross objected to this foundational ruling. Thus, Blue Cross neither induced the trial court's error regarding Miller's testimony nor failed to preserve this issue for appeal. (*Telles Transport, Inc. v. Workers' Comp. Appeals Bd.* (2001) 92 Cal.App.4th 1159, 1167.)[2]

### 3. *The trial court's errors were prejudicial.*

The trial court's error in ruling that section 1300.71(a)(3)(B) provided the exclusive standard for valuing the reasonable value of the post-stabilization services was

---

[2] Similarly, Blue Cross did not invite error when its counsel argued to the jury in closing that the issue was "whether the implied-in-fact contract was for Blue Cross to pay full billed charges or whether it was to pay the CMAC rate" and that Blue Cross was required to, and did, pay the CMAC rate. Under the circumstances caused by the trial court's erroneous rulings, Blue Cross was """endeavoring to make the best of a bad situation for which [it] was not responsible.""" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 213.)

prejudicial. Based on this ruling, discovery was curtailed and relevant and admissible evidence was excluded. The only measure of value before the jury was Hospital's full billed charges. The jury should have been permitted to hear and consider evidence on the full range of fees that Hospital both charges and accepts as payment for similar services in determining the reasonable value of the post-stabilization services provided to the Blue Cross Medi-Cal beneficiaries. It is reasonably probable that a result more favorable to Blue Cross would have been reached if such evidence had been admitted. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Accordingly, Blue Cross is entitled to a new trial on damages.

## DISPOSITION

The judgment is reversed and the matter remanded for a new trial on damages, including additional discovery. Appellants are awarded their costs on appeal.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
KANE, J.


_____
FRANSON, J.