Filed 5/23/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SANJIV GOEL, M.D., INC., | B267012 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 543227) |
| v. | |
| REGAL MEDICAL GROUP, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Rolf M. Treu, Judge.  Affirmed.

Pick & Boydston and Brian D. Boydston for Plaintiff and Appellant.

Doll Amir & Eley, Michael M. Amir and Lloyd Vu for Defendant and Respondent.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S. McCallum and Jeffrey J. Maurer for California Physicians'

Service dba Blue Shield of California as Amicus Curiae on behalf of Defendant and Respondent.

_____

Appellant Sanjiv Goel, M.D., Inc.[1] appeals from a judgment following a court trial on his quantum meruit claim for fees for emergency treatment rendered to four patients as an interventional cardiologist.  The trial court found that the fees paid by Respondent Regal Medical Group, Inc. (Regal) for this treatment reflected the reasonable value of the services that Goel provided.

The sole issue presented on appeal is whether the trial court employed the correct legal standard in determining the reasonable value of Goel's services.  We conclude that the court did use the correct standard, and we therefore affirm.

## BACKGROUND

### 1.   *Goel's Patient Treatments and Billing*

Goel is a board certified interventional cardiologist. Interventional cardiology is a specialized branch of cardiology that, as its name suggests, involves procedures to intervene in preventing cardiovascular problems.  Goel has been in private practice since 1992.

Goel performed the emergency intervention procedures at issue in this case on four different patients at Los Robles Hospital in Thousand Oaks, California (Patients 1–4).  The procedures included diagnosis of cardiac conditions with angiograms,

---

[1] Appellant is a medical practice owned and operated by Dr. Sanjiv Goel.  Because the legal form of Dr. Goel's practice is not at issue here, we refer to appellant simply as "Goel."

removal of blood clots, and placement of stents in cardiac arteries.

Patients 1–4 were each covered by a medical plan for which Regal was responsible. Goel does not have a contract with Regal for the services he provides. Goel therefore billed Regal for the procedures he performed on Patients 1–4 using prices that he unilaterally set. Goel testified that he based his prices on various factors, including the "value of the service that was given to the patient"; his "skill set"; his training and experience; and the personal risk he undertook from exposure to radiation and the repeated use of heavy lead gowns. His prices were incorporated into a database of charges, or a "chargemaster," with standard rates he charged for each procedure listed by "CPT" code.[2] For procedures that he deemed to involve an "extreme degree of complexity" he sometimes increased the charges in particular cases.

Goel updated his fees periodically. In doing so, he did not consult with others and did not take any steps to determine what other cardiologists in Ventura or Los Angeles counties were charging. He also did not consider what Medicare pays for the same procedures. Medicare rates are fixed and nonnegotiable.

Goel terminated all his contracts with insurance companies in 2010 because he did not want to be "under anyone else's thumb." However, he did have a contract with Medicare to treat

---

[2] " 'CPT' is the acronym for the American Medical Association's 'Current Procedural Terminology.' " (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2014) 232 Cal.App.4th 543, 550, fn. 5.) Each CPT code identifies a particular medical procedure. (*Ibid.*)

nonemergency patients. The Medicare rates for the procedures Goel performed on Patients 1–4 totaled $6,413.36.

Goel's bills to Regal identified each procedure separately by CPT code with a price for each procedure. The amounts that he received from Regal for each procedure were above the Medicare rates but were well below what he billed. Goel's bills for all of the procedures he performed on Patients 1–4 totaled $275,383.16. Regal paid $9,660.86.

Goel filed suit against Regal to collect the difference between what he billed and what Regal paid.

## 2. *Trial Proceedings*

The case was tried to the court on April 27 and 28, 2015, on a single claim for quantum meruit. Goel introduced evidence of payments that he had accepted from other insurers at or close to his full billed rates for the same procedures that he performed on Patients 1–4. This evidence included only those payments that Goel had accepted and that were not in dispute or in litigation.

Regal presented expert testimony concerning amounts billed by other medical providers in Los Angeles and neighboring counties for the services that Goel provided to Patients 1–4. Regal's expert, Dr. Henry Miller, testified that he examined a database maintained by a company called Fair Health that "calculates the average charge and range of charges for each CPT code in each geographic area." The data in the Fair Health database included fees charged by the approximately 400 interventional cardiologists in communities in Los Angeles, Riverside, and San Diego counties for contracted and noncontracted services. Miller concluded that Goel's charges were "exceptionally high" and exceeded the 90th percentile in the

4

Fair Health database, which is the highest percentile that it records.

Miller also compared Regal's payments to Goel for the services provided to Patients 1–4 with the rates that Medicare pays for the same services. He concluded that Regal's payments for Goel's services to Patients 1–4 were about 150 percent of the Medicare rates for those services. He testified that the average range of rates by private payors in the industry ranged from 135 percent to 140 percent of the Medicare rates.

The trial court found in favor of Regal. The court issued a statement of decision concluding that "the amounts paid by [Regal] reflected the reasonable value of services." The court credited the testimony of Miller that the rates Regal paid were above the national average for the procedures that Goel performed. The court found that Goel's rates "were at the highest and most expensive percentile when compared to his colleagues."

**DISCUSSION**

Both parties agree that Goel was entitled to reimbursement for the emergency medical services that he provided to Patients 1–4. Both parties also agree that, in the absence of any contract between Goel and Regal, Goel was entitled to receive payment for the "reasonable and customary" value of his services. The parties disagree about how to define that standard.

Goel argues that the decision by the Fifth District Court of Appeal in *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260 (*Children's Hospital*) required the trial court to consider *only* the payments that Goel accepted from other payors for similar services in determining the reasonable value of his services. Thus, Goel argues that the trial court erred in considering evidence of fees paid by Medicare

5

and the amounts charged by other medical providers for the same services in determining the reasonable value of his services.

Regal agrees that *Children's Hospital* describes the governing standard, but argues that, under that standard, the trial court here properly considered a range of factors relevant to quantum meruit claims to determine the market value of Goel's services. Regal claims that those factors properly included: (1) fees charged by other emergency providers for the same procedures that Goel performed on Patients 1–4, and (2) the rates that Medicare pays for those procedures.

We agree with both parties that the court in *Children's Hospital* correctly applied the governing standard. However, we agree with Regal that Goel has interpreted that standard too narrowly. Properly interpreted, *Children's Hospital* supports the decision that the trial court made here to consider a variety of evidence to determine the "reasonable market value" of the services that Goel provided under quantum meruit principles. We therefore affirm.

1.     ***Standard of Review***

The issue that Goel presents is, in essence, a dispute about the evidence that the trial court considered. Issues concerning the admissibility of evidence are ordinarily reviewed under the abuse of discretion standard. However, when the issue is one of law, a de novo standard applies. (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1277.) Here, the issue of what charges and payments may properly be considered in determining the reasonable value of a medical provider's services is one of law. (*Ibid*.)[3] We therefore employ the de novo standard of review.

---

[3] This legal issue is different from the practical decision about what *legally permissible* evidence a trial court might decide

6

## 2. *The Decision in* Children's Hospital

Like this case, *Children's Hospital* involved the proper standard to apply to a medical provider's quantum meruit claim for emergency medical services. The emergency patients in that case were covered by a Medi-Cal managed health plan (the Plan) during a period in which the Plan had no contract with the hospital. In that situation, the law requires a hospital's emergency department to provide patients with " 'an appropriate medical screening examination' and 'such treatment as may be required to stabilize' any emergency medical condition without regard to the patient's insurance or ability to pay." (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1266, quoting 42 U.S.C. § 1395dd(a), (b).) Health care providers are entitled to reimbursement from patients' health care service plans for the emergency services that they provide. (*Children's Hospital,* at pp. 1270–1271; Health & Saf. Code, § 1371.4, subd. (b) ["A health

---

is relevant and helpful to consider in a particular quantum meruit case. As explained below, consistent with the law on quantum meruit, the decision in *Children's Hospital* leaves considerable discretion to trial courts to determine what billing and payment evidence might be relevant to a particular case. (See *Children's Hospital, supra,* 226 Cal.App.4th at p. 1275 ["the facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at issue"].) Such discretionary decisions are reviewed under the abuse of discretion standard. (*Moore v. Mercer* (2016) 4 Cal.App.5th 424, 442–444.) Here, Goel argues only that the trial court erred as a matter of law in considering certain types of payment evidence in determining the reasonable value of his services. We therefore review only the legal question whether the trial court employed the correct standard in deciding what evidence to consider.

7

care service plan, or its contracting medical providers, shall reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee"]; Health & Saf. Code, § 1371.35, subd. (a).)

The Department of Managed Health Care (the Department) has promulgated regulations concerning the reimbursement of such claims. (See *Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1271.) California Code of Regulations, title 28, section 1300.71(a)(3)(B) (hereafter section 1300.71(a)(3)(B)) defines the "reimbursement" of a claim for noncontracted providers as payment of "the reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration: (i) the provider's training, qualifications, and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case."

The court in *Children's Hospital* noted that this definition incorporates language from *Gould v. Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1059 (*Gould*). (See *Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1272.)[4] After examining the history of the Department's adoption of section 1300.71(a)(3)(B), the court in *Children's Hospital* concluded that the Department intended section 1300.71(a)(3)(B) to incorporate the concept of

---

[4] The court in *Gould* identified these factors as a guide for the trial court in determining the reasonableness of a psychiatrist's fees for treatment of police officers.

8

quantum meruit and to preserve existing law that payors should reimburse noncontracted providers based upon the "reasonable and customary value" of their services. (*Id.* at pp. 1272–1273.) The court found that section 1300.71(a)(3)(B) sets the "minimum criteria for reimbursement of a claim, not the exclusive criteria." (*Id.* at p. 1273.)

The issue in *Children's Hospital* was whether the trial court had properly precluded the jury from considering evidence of amounts that the hospital had *actually* been paid in the past for the medical services in question, rather than the undiscounted charges included in the hospital's chargemaster billing schedule. Relying upon the precise language of factor (iii) in section 1300.71(a)(3)(B), the trial court had limited the jury's consideration only to the "fees usually *charged* by the provider," without permitting consideration of the fees that were actually *paid.* (§ 1300.71(a)(3)(B)(iii), italics added.) However, the evidence showed that "in 2007 and 2008, less than 5 percent of the payors paid Hospital the full billed charges." (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1268.)

The appellate court held that the trial court erred in ruling that section 1300.71(a)(3)(B) provided the exclusive standard for determining the reasonable value of the hospital's services. (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1276.) The court held that "under settled quantum meruit principles, relevant evidence of the reasonable/market value of the services provided includes the full range of fees that [the hospital] both charges and accepts as payment." (*Ibid.*) The court explained that quantum meruit requires a flexible approach: "[T]he facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at

9

issue, i.e., the price that would be agreed upon by a willing buyer and a willing seller negotiating at arm's length.  Specific criteria might or might not be appropriate for a given set of facts." (*Id.* at p. 1275.)

**3.** ***The Trial Court Properly Applied the Legal Standard Explained in* Children's Hospital**

Despite the language in *Children's Hospital* concerning the range of evidence that may be considered in determining the reasonable value of medical services, Goel argues that the court's "reasoning and logic" show that just one factor is controlling. Goel claims that "the average of the payments made to a medical provider for particular medical services dictates the 'market value' and therefore the 'reasonable and customary value.' " Goel limits this factor even further, claiming that the payments must be "accepted," and not disputed, and must be the result of negotiations between a willing buyer and a willing seller.

Goel bases his argument on discussion in *Children's Hospital* in which the court emphasized the significance of the amounts actually paid to a medical provider rather than the amounts billed.  For example, Goel quotes the court's statements that "[r]easonable value is market value, i.e., what [the hospital] normally receives from the relevant community for the services it provides" (*Children's Hospital, supra*, 226 Cal.App.4th at p. 1277), and "[t]he scope of the rates accepted by or paid to [the hospital] by other payors indicates the value of the services in the marketplace" (*id.* at p. 1275).

Applying this allegedly controlling standard, Goel claims that the trial court here should not have considered evidence of payments accepted by other medical providers for similar emergency services or payments made by Medicare for such

10

services.  Thus, Goel claims that the reasonable value of his services is determined as a matter of law by rates that he was previously successful in obtaining from private payors.

Goel's argument depends upon finely parsing language in the *Children's Hospital* opinion and applying it to an issue that is different from the one the court considered.  This approach to interpretation is incorrect.  Like all decisions, the opinion in *Children's Hospital* must be understood in the context of the issue that was presented for decision.  "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered."  (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)

As discussed above, the issue in *Children's Hospital* was whether the trial court improperly limited the jury to considering only the hospital's fully billed charges rather than what insurers actually *paid*.  In light of this focus, the opinion naturally emphasized the significance of amounts previously accepted by the medical provider as an indication of market value.  However, the case cannot fairly be read to hold that this factor is the *only* determinant of reasonable market value as a matter of law.

In fact, the court in *Children's Hospital* concluded that a quantum meruit claim for medical services may require consideration of a "wide variety of evidence" bearing upon the reasonable value of those services.  (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1274.)  The court held that this evidence is not limited even by the factors identified in section 1300.71(a)(3)(B), but will depend upon the "facts and circumstances of the particular case."  (*Id.* at p. 1275.)  Thus, the holding in *Children's Hospital* did not limit the evidence relevant

11

to the reasonable value of medical services to any single factor, but rather confirmed that, consistent with the law on quantum meruit, any evidence bearing upon the "reasonable market value" of such services is relevant.  (*Ibid.*)

Under this flexible standard, the trial court here was not required to accept Goel's evidence of fees that he previously accepted from private payors as the only determinant of market value.  In particular, the trial court could properly consider Regal's expert testimony concerning fees charged by other medical providers for similar emergency services.

Nothing in *Children's Hospital* or the law on quantum meruit suggests that this evidence was inadmissible.  To the contrary:  Section 1300.71(a)(3)(B) itself identifies the "prevailing provider rates charged in the general geographic area in which the services were rendered" as a factor to consider.  (Section 1300.71, subd. (a)(3)(B)(iv).)  *Gould*—the decision on which the section 1300.71(a)(3)(B) factors were based—also identified the "fees usually charged" in the provider's general geographic area as a relevant factor.  And, as the court noted in *Children's Hospital*, presumably the fees "charged" in the context at issue in *Gould*—i.e., hourly fees for psychiatrists—were also the fees that were actually paid.  (See *Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1275.)

Goel's interpretation of the *Children's Hospital* decision has somewhat more force in connection with his argument that the trial court should not have considered Medicare rates for *prestabilization* emergency services.  *Children's Hospital* concluded that all rates "that are the subject of contract or negotiation," including rates paid by government payors, are relevant to determine the reasonable value of medical services.

12

The medical services at issue in *Children's Hospital* were for care provided after emergency patients had been stabilized. For such care, the hospital was required to seek authorization from the Medi-Cal provider prior to the treatment. (*Children's Hospital, supra*, 226 Cal.App.4th at pp. 1266–1267.) Goel argues that the government rates at issue in *Children's Hospital* therefore were the product of agreement, because the hospital had some choice in whether to treat the poststabilization patients. In contrast, doctors providing prestabilization emergency services have no choice in whether to treat Medicare patients and their acceptance of Medicare rates for such patients does not reflect any agreement.

While this was a reasonable argument to present to the fact finder at trial, the distinction that Goel makes is not a persuasive reason to adopt an absolute rule precluding the consideration of Medicare rates in determining the reasonable value of emergency medical services. The difference between the choice involved in providing prestabilization and poststabilization emergency services might affect the weight that a court gives to evidence of Medicare rates in a particular case. However, that difference does not mean that Medicare rates are irrelevant to the reasonable value of prestabilization emergency services as a matter of law.

The record here shows why a bright line rule precluding consideration of Medicare rates for prestabilization emergency services would be inappropriate under quantum meruit principles as explained in *Children's Hospital*. Regal's expert, Miller, explained the components of Medicare rates and testified that, in recognition of the methodology used to calculate Medicare rates, it is typical in the health care industry for payors to use

13

the Medicare rate in determining the rates that they will pay. He stated that, in his experience and based upon nationwide research, "anywhere from 130 to 140 percent of what Medicare pays is the average for what all health insurers pay."

Thus, there was evidence that Medicare rates are relevant to the *market* value of emergency services even though a physician has no choice but to accept those rates when initially treating particular Medicare patients in an emergency. Miller confirmed that Regal's payments to Goel were "consistently 150 percent" of what Medicare pays for the services that Goel provided. The court relied on Miller's testimony in finding that Regal's payments "exceeded the Medicare payments and were within the industry averages."

Goel's contention that Medicare rates for emergency services are not the product of agreement and are therefore irrelevant to the rates he will accept is also inconsistent with his own testimony. He testified that he had a contract with Medicare that he entered into "willingly," and he acknowledges on appeal that he "has accepted patients covered by Medicare and Medi-cal for non-emergency services, and has contracts with Medicare and Medi-cal for that limited purpose." Whether or not the Medicare rates for the nonemergency services that Goel agreed to accept were the same as the emergency services at issue here, he cannot claim that Medicare rates are irrelevant to his practice.

Goel was free to argue at trial that he was obligated to treat prestabilization emergency Medicare patients, and that the Medicare rates that he received for such services should be given little or no weight in determining the reasonable value of those services. In fact he did so. He also cross-examined Miller about the difference between a physician's obligation toward emergency

14

patients in various circumstances and the components of Medicare pricing.

Medicare rates, like other evidence bearing upon the determination of a reasonable rate for a particular medical procedure, might be more or less probative in light of the facts of the particular case. But that is a decision for the trial court to make within the scope of its discretion. We decline to hold that Medicare rates are irrelevant to prestabilization emergency services as a matter of law. The trial court here had a reasonable basis in the evidence to conclude that Medicare rates were relevant to the market rate for the medical services at issue, and we do not find any legal error in the court's decision to consider those rates.

## DISPOSITION

The judgment is affirmed. Regal Medical Group, Inc., is entitled to its costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.

16