Filed 12/16/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CALIFORNIA INSURANCE GUARANTEE ASSOCIATION et al.<br><br>Petitioners,<br><br>v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and ELITE SURGICAL CENTERS, ESCONDIDO, L.P. et al.,<br><br>Respondents. | D065072<br><br>(WCAB No. ADJ2806916) |

Original proceeding to review a decision of the Workers' Compensation Appeals Board. Affirmed.

Heggeness, Sweet, Simington & Patrico and Clifford D. Sweet III for Petitioners.

Law Offices of Allweiss & McMurtry and Michael A. Marks for California Workers' Compensation Institution as Amicus Curiae on behalf of Petitioner California Insurance Guarantee Association.

Procopio, Cory, Hargreaves & Savitch, Anthony J. Dain and Brian J. Kennedy for Respondents Elite Surgical Centers, Del Mar, L.P., Point Loma Surgical Center, L.P., and Elite Surgical Centers, Escondido, L.P.

David Bryan Leonard for California Society of Industrial Medicine & Surgery, Inc., as Amicus Curiae on behalf of Respondent Workers' Compensation Appeals Board.

# I.

## INTRODUCTION

We issued a writ of review on the petition filed by the petitioners in this matter to address the two questions raised in the petition: (1) Does the Workers' Compensation Appeals Board (the Board) retain jurisdiction over a medical billing dispute pertaining to more than 300 consolidated claims, after the Legislature passed significant workers' compensation reform legislation that created a new administrative independent review process for the resolution of billing disputes?; and (2) if the Board does retain jurisdiction over this dispute, is there substantial evidence to support the workers' compensation judge's (WCJ) findings of fact regarding his determination of the "reasonable fee" to be paid for arthroscopic knee procedures, arthroscopic shoulder procedures, and epidural injection procedures performed at three commonly managed ambulatory surgical center (ASC) facilities in San Diego County?

We conclude that although the text of the relevant legislation and resulting statutes is ambiguous, the most reasonable interpretation of the legislation is that it does not

2

divest the Board of jurisdiction to decide the dispute at issue in this case. We further

conclude that the WCJ's findings, which the Board adopted in its decision on petitioners'

motion for reconsideration, are supported by substantial evidence. We therefore affirm

the decision of the Board.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Petitioners[1] were defendants in an action before the Board brought by respondents

Elite Surgical Centers, Escondido, L.P., Elite Surgical Centers, Del Mar, L.P., and Point

Loma Surgical Center, L.P. (collectively Elite), concerning billing disputes related to the

reasonable facility fees for arthroscopic knee procedures, arthroscopic shoulder

procedures, and epidural injection procedures provided by Elite to injured workers prior

to January 1, 2004.

The dispute over billing began when, in November 2000, Elite increased the

charges that it billed for certain outpatient services, including the services at issue in this

proceeding. The petitioners disputed the reasonableness of Elite's increased charges.

Rather than remitting the amounts billed, the petitioners paid only the amounts that they

believed were appropriate for the services performed. Elite filed notices of liens with the

---

[1]    The eight petitioners are the following employers and/or employers' insurance companies: California Insurance Guarantee Association; AIU Insurance Company; American Home Assurance Company (as insurer for Wal-Mart Associates, Inc.); Insurance Company of the West; Explorer Insurance Company; Solar Turbines, Inc.; BAE Systems Ship Repair, Inc.; and ACE American Insurance Company. The California Insurance Guarantee Association took over liability for one of the original defendants in this case after that defendant was declared insolvent and ordered into liquidation.

3

Board's San Diego office, seeking to collect the remaining balances.[2]  All of the facility

fee bills that are subject to consolidation in this matter are for services rendered between

November 2000 and December 31, 2003.

Division 4 of the Labor Code sets forth an extensive regulated system for the

medical treatment of employees who are injured at work.  (Lab. Code, § 3200 et seq.)[3]

As part of this system, the administrative director of the Division of Workers'

Compensation (DWC) is responsible for adopting and periodically revising an official

medical fee schedule (OMFS) that establishes the "reasonable maximum fees" to be paid

for medical treatment provided to employees who are injured at work.  (§ 5307.1.)  For

the period between April 13, 2001 and December 31, 2003, the administrative director

adopted an OMFS with reasonable maximum fees for services performed by 21 San

Diego area hospitals.  (8 Cal. Code Regs., § 9792.1.)  This OMFS did not cover facility

fees charged by ASCs.  As a result, there was no established "reasonable maximum fee"

for procedures provided at ASCs during the relevant time period.[4]

---

[2]     Elite originally filed thousands of liens for services rendered prior to January 1,
2004.  The Board issued several orders to consolidate these liens.  The most recent
consolidation order involved 436 cases, but after resolution of a number of the cases, 333
cases remained unresolved at the time of trial before the WCJ.

[3]     Further statutory references are to the Labor Code unless otherwise indicated.

[4]     The Legislature amended the Labor Code in 2003 to require the administrative
director to "adopt and revise periodically an [OMFS]" to "establish reasonable maximum
fees paid for medical services other than physician services, drugs and pharmacy

At the time the parties' dispute over Elite's bills arose, billing disputes were resolved through litigation before the Board. In a billing dispute case, the parties litigate before a WCJ, who acts for the Board in the first instance. In this case, a 17-day trial was held before the WCJ regarding the reasonable value for certain facility services provided by Elite in the consolidated cases. Both parties presented extensive documentary and testimonial evidence.

At trial, Elite introduced in evidence the billing itemizations and operative reports for the facility services, to demonstrate the range of facility services that Elite had provided for epidural, knee and shoulder procedures during the relevant time period. David Kupfer, M.D., who served as the medical director and the general partner of Elite, reviewed each of the bills and operative reports and described the multiple, distinct procedures performed by the physician, the facility services provided by Elite, and the differences in services between and among bills and reports. For example, Dr. Kupfer testified that as to a number of the disputed bills, although the bills identified only a

services, health care facility fees, home health care, and all other treatment, care, services, and goods described in Section 4600 and provided pursuant to this section" for dates of service after January 1, 2004. (Stats. 2003, ch. 639, § 35, subd. (a).) This OMFS would include facility fees to be paid to an ASC. The Legislature also amended the Labor Code to provide that "the maximum facility fee for services performed in an [ASC], or in a hospital outpatient department, may not exceed 120 percent of the fee paid by Medicare for the same services performed in a hospital outpatient department." (Stats. 2003, ch. 639, § 35, subd. (c).)

single "CPT code,"[5] the operative reports demonstrated that in fact, multiple procedures had been performed, thereby increasing the facility fees for the services provided by Elite. The petitioners' expert, Theresa Cokley, confirmed that, at least as to one of the bills, five separate procedures had actually been performed, despite the fact that only a single CPT code appeared on the bill. This evidence demonstrated that although only a single CPT code appeared on the bills, with respect to many of the bills, Elite had in fact provided multiple, distinct services.

Elite also presented collection data compiled over a period of approximately seven years to demonstrate that it generally collected 62.7 percent of the amount that it charged for facility fees.[6] In addition, Elite presented the testimony of its expert, Rocky Gentner, a health care financial management consultant, regarding the usual and customary fees that Elite and other ASCs accepted as full payment for facility services provided between 2000 and 2003. To compile this information, Gentner relied on a database of facility fee charges and payment amounts for all closed cases from all payers for facility services provided between January 1, 2000 through December 31, 2003, for all southern

---

[5]    CPT is the acronym for the American Medical Association's "Current Procedural Terminology." "CPT codes were jointly developed by the American Medical Association and the Health Care Financing Administration and are the standardized nomenclature for use in insurance claims." (*People ex rel. Allstate Insurance Co. v. Muhyeldin* (2003) 112 Cal.App.4th 604, 607.) A CPT code is used to identify and refer to a particular medical, surgical, and/or diagnostic procedure or service.

[6]    For example, between 2000 and 2003, Elite recovered $41,984,699 of the $66,995,390 that it billed for facility fees.

California ASCs that were willing to participate in the database.  Nineteen ASCs

participated in the database, which contained information regarding 73,319 closed cases.[7]

The petitioners presented a report and oral testimony from their expert, Henry

Miller, Ph.D.  Dr. Miller offered his expert opinion that Elite's charges were grossly

disproportionate to those of other San Diego County providers, that Gentner's analysis

and opinion were fundamentally flawed, and that the ASC OMFS that went into effect as

of January 1, 2004 is the only objective and fair method for determining a reasonable fee

for Elite's services during the relevant time period.  Dr. Miller also considered what other

ASC providers charged and accepted for similar services during the relevant period.

---

[7]     The petitioners suggest that Gentner's data should be viewed with suspicion
because he "based his opinions on his 'statistical analysis' of unauthenticated data not in
evidence" and "undertook no analysis as to whether any of the underlying services had
been correctly coded or billed."  However, the WCJ admitted this evidence, over
petitioners' objections.  Although petitioners state in their briefing that they "now renew
[the] evidentiary objections [that they made to the WCJ and in their petition for
reconsideration]," they do not specifically request that this court *review* the WCJ's rulings
with respect to this evidence.  Petitioners fail to provide any legal argument in their
briefing in this proceeding as to how or why the WCJ's rulings with respect to the
evidence in question were erroneous.  Rather, they simply say, for example, "Petitioners
filed pre-trial motions in limine, offered multiple evidentiary objections throughout the
trial, and filed post-trial motions to strike Gentner's objectionable evidence," and then cite
to numerous pages in the volumes of exhibits filed with the petition for review to
demonstrate where in the record they objected to this evidence.  This is insufficient to
articulate any reversible error on the part of the WCJ.  "Whether legal or factual, no error
warrants reversal unless the [party seeking review] can show injury from the error."  (*City
of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286.)  Further, " '[a]ppellate briefs
must provide argument and legal authority for the positions taken.  "When an appellant
fails to raise a point, or asserts it but fails to support it with reasoned argument and
citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to
develop appellants' arguments for them.' " (*Cahill v. San Diego Gas & Electric Co*.
(2011) 194 Cal.App.4th 939, 956.)

According to Dr. Miller, Elite's charges for the procedures at issue were more than two times the maximum amount allowed by law for full service inpatient hospitals in the same geographic area; up to seven times more than what Elite itself had customarily charged for the same services prior to increasing its charges in 2000; up to 10 times more than what Elite customarily accepted as full payment prior to 2000; up to four to five times more than the fees charged by other ASCs in the same geographic area; up to 24 times more than the amount accepted for similar services by other ASCs in the same geographic area; and up to seven times more than the maximum facility fee under the ASC OMFS in effect after January 1, 2004, for the same or similar services. According to Dr. Miller, the OMFS for ASCs in effect after January 1, 2004 is easily identifiable, objective, transparent, easy to calculate, provides fair compensation, and would provide an expeditious and straightforward way to resolve Elite's unresolved bills.

On January 1, 2013, after the case had been submitted to the WCJ but before the WCJ issued a decision, certain legislative changes to the workers' compensation law that were enacted in 2012 became effective.

One month later, on February 1, 2013, the WCJ issued his decision regarding the consolidated claims. The WCJ determined that the reasonable fee for arthroscopic knee procedures was "$5,207.85 or the amount billed, whichever is less." This amount is approximately 28 percent of the amount that Elite customarily billed for such procedures, and is $5,377 less than what Elite stated that it accepted, on average, per bill. The reasonable fee for percutaneous lysis of epidural adhesions was "$2,337.52, or the

8

amount billed, whichever is less." This amount reflects approximately 45 percent of the amount that Elite customarily billed for these procedures, and is approximately $854 less than what Elite stated it was able to collect per bill. Finally, the WCJ determined that the reasonable fee for arthroscopic shoulder procedures is "$4,340.95, or the amount billed, whichever is less." This amount is approximately 22.5 percent of what Elite customarily billed for these procedures, and is approximately $14,926 less than what Elite stated that it accepted, on average, per bill.

In making these findings, the WCJ stated the following:

> "A broad range of evidence was presented and considered in this case. It is noteworthy that no one proposed a formula incorporating all of the relevant factors into a broadly applicable equation to arrive at 'reasonable.' Maybe that is because there is none.
>
> "The universe of 'relevant factors' is too big, subjective, random, and dissimilar for this. But the universe of relevant factors at least establishes that 'reasonable' facility fees will not be less than what Medicare would allow, and not more than what Elite contends it has collected on average over the years for the various types of facility fees.
>
> "Within this range of evidence, there are two other relevant factors that significantly narrow the range of reasonable and are well constructed for broad and objective application. One is the Official Medical Fee Schedule for ambulatory surgical centers that went into effect on January 1, 2004. The other is the Official Medical Fee Schedule for hospitals in effect from April 13, 2001 through December 31, 2003. The halfway point between these two schedules constitutes the reasonable facility fee."

The petitioners moved for reconsideration of the WCJ's order. The WCJ issued a Report and Recommendation on the petition for reconsideration, recommending that the

9

petition for reconsideration be denied in its entirety. In the Report and Recommendation, the WCJ reviewed much of the evidence presented, and set forth the factual and legal bases for his determination of the reasonable value of the services provided by Elite for the procedures in dispute. The Board granted reconsideration. After considering the petition for reconsideration, Elite's answer, and the WCJ's Report and Recommendation, the full Board adopted the WCJ's Report and Recommendation, and affirmed in its entirety the WCJ's original decision rendered on February 1, 2013.

The petitioners filed a petition for writ of review in this court. The Board filed an informal response pursuant to this court's request. Elite filed a return in opposition to the petition for writ of review. The California Workers' Compensation Institute filed an amicus curiae brief in support of the petition, and the California Society of Industrial Medicine and Surgery, Inc., filed an amicus curiae brief in support of the Board.

III.

DISCUSSION

A.     *Legal standards on a petition for review of a Board decision*

As to findings of fact, a court defers to the Board's findings if those findings are supported by substantial evidence. (§ 5952; *Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1290.) "The term 'substantial evidence' means evidence 'which, if true, has probative force on the issues. It is more than a mere scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . . It must be reasonable in nature, credible, and of

10

solid value . . . .' " (*Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd*. (1983) 34 Cal.3d 159, 164.) When considering a petition for a writ of review on a decision of the Board, " ' " '[t]his court must determine whether the evidence, when viewed in light of the entire record, supports the award of the WCAB. This court may not reweigh the evidence or decide disputed questions of fact.' " ' " (*Tenet/Centinela Hospital Medical Center v. Workers' Comp. Appeals Bd.* (2000) 80 Cal.App.4th 1041, 1045-1046 (*Tenet/Centinela*).)

" ' " 'Questions of statutory interpretation are, of course, for [a] court to decide.' " ' " (*Tenet/Centinela, supra,* 80 Cal.App.4th at pp. 1045-1046.) However, although the Board's conclusions on questions of law are not binding on this court (*Kuykendall v. Workers' Comp. Appeals Bd*. (2000) 79 Cal.App.4th 396, 402), and the interpretation of a labor statute is a legal question subject to our independent review (*Boehm & Associates v. Workers' Comp. Appeals Bd*. (1999) 76 Cal.App.4th 513, 515-516), we nevertheless "generally defer to the [Board's] interpretation of labor statutes unless clearly erroneous" (*City of Long Beach v. Workers' Comp. Appeals Bd*. (2005) 126 Cal.App.4th 298, 316, fn. 5).

B.    *The Board's jurisdiction to determine this matter*

Petitioners contend that as a result of legislative action in 2012, effective as of January 1, 2013, the Board lacked jurisdiction to resolve this medical billing dispute. Specifically, petitioners argue that through its passage of Senate Bill No. 863 (hereafter,

S.B. 863) (Stats, 2012, ch. 363), the Legislature divested the Board of jurisdiction over all pending and future medical billing disputes.[8]

As passed, S.B. 863 includes 86 provisions, and makes a substantial number of changes to a variety of aspects of workers' compensation law. Among the numerous and significant changes implemented by the Legislature in S.B. 863 is the creation of an independent bill review (IBR) process by which billing disputes between providers and

---

[8] In their petition for reconsideration to the Board, the petitioners did not make precisely the same argument that they raise in this review proceeding. Although the petitioners referenced the new independent bill review system codified by S.B. 863 in their petition for reconsideration, they did so in furtherance of their argument that "retrospective application of the OMFS [for outpatient surgery centers in effect as of January 1, 2004] to resolve Elite's bills is fair, reasonable, expeditious, and consistent with the nationally recognized industry standards," and that "Elite has presented no plausible alternative method." In fact, the heading for the section in which the petitioners cited S.B. 863 was, "Substantial evidence supports application of the ASC fee schedule in effect on January 1, 2004." At one point in the petition for reconsideration, petitioners asserted, "Finally, the WCJ no longer has jurisdiction to determine the actual amount Defendants might owe a lien claimant ASC as those claims are now governed by the independent bill review process." However, they made no legal argument on this point and instead, immediately refocused on their argument that "[s]ubstantial evidence in this case supports a finding of fact that [a] reasonable facility fee for Elite's services rendered before January 1, 2004 is the maximum amount allowed under the Official Medical Fee Schedule for San Diego County [ASCs] that went into effect on January 1, 2004."

Although Elite contends that the petitioners have forfeited this argument under section 5904 and *Health v. Workmen's Comp. App. Bd.* (1967) 254 Cal.App.2d 235, as petitioners point out, this is an issue regarding the Board's subject matter jurisdiction to determine this dispute, and subject matter jurisdiction is an issue that may be raised at any time until the finality of a decision. (See *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 307, fn. 9.)

12

employers are to be resolved administratively.[9] In general, the new IBR process requires an employer to respond, within certain time limits, to a bill sent by a medical provider, and to provide an "explanation of review" detailing the reasons for the action that the employer has decided to take with respect to the bill, i.e., to pay the bill in full, pay an adjusted amount, or deny payment. If a provider disputes the amount that an employer pays on the bill, the provider may request a "second review" within a certain time period. S.B. 863 requires requests for a second review to be made in conformity with a form to be created by the administrative director, and to include certain information listed in the statute. If a provider is still unhappy with the amount paid by an employer after receiving an employer's explanation of review after the second review, the provider may request to have an independent reviewer review the bill and settle the dispute between the parties.[10]

S.B. 863 amends section 4603.2 by adding the following language as subdivision (e), which sets forth the requirements for the second review that a medical provider may request (and must request) prior to seeking independent review of a bill:

---

[9]   S.B. 863 also created a new administrative process by which disputes concerning medical treatment may be resolved without resort to litigation before the Board. The new "independent medical review" (IMR) process is "patterned after the long-standing and widely applauded IMR process used to resolve medical disputes in the health insurance system." (Sen. com. on Labor and Industrial Relations, Analysis of Sen. Bill No. 863 (2011-2012 Reg. Sess.) Aug. 21, 2012.)

[10]   Because the specifics of the new IBR process are important to our analysis of the issue concerning the Board's jurisdiction over billing disputes that were pending as of the effective date of S.B. 863, we will provide the full text of some of the relevant provisions.

13

"(e)(1) If the provider disputes the amount paid, the provider may request a second review within 90 days of service of the explanation of review or an order of the appeals board resolving the threshold issue as stated in the explanation of review pursuant to paragraph (5) of subdivision (a) of Section 4603.3. The request for a second review shall be submitted to the employer on a form prescribed by the administrative director and shall include all of the following:

"(A) The date of the explanation of review and the claim number or other unique identifying number provided on the explanation of review.

"(B) The item and amount in dispute.

"(C) The additional payment requested and the reason therefor.

"(D) The additional information provided in response to a request in the first explanation of review or any other additional information provided in support of the additional payment requested.

"(2) If the only dispute is the amount of payment and the provider does not request a second review within 90 days, the bill shall be deemed satisfied and neither the employer nor the employee shall be liable for any further payment.

"(3) Within 14 days of a request for second review, the employer shall respond with a final written determination on each of the items or amounts in dispute. Payment of any balance not in dispute shall be made within 21 days of receipt of the request for second review. This time limit may be extended by mutual written agreement.

"(4) If the provider contests the amount paid, after receipt of the second review, the provider shall request an independent bill review as provided for in Section 4603.6." (S.B. 863, § 36; Lab. Code, § 4603.2, subd. (e).)

In turn, section 4603.6 of the Labor Code, which was added by section 39 of S.B. 863, discusses when an IBR may be requested, what will occur if an IBR is not requested

14

within the prescribed time, how such a request is to be made, and how the IBR will be

assigned to, and addressed by, an independent reviewer:

"(a) If the only dispute is the amount of payment and the provider has received a second review that did not resolve the dispute, the provider may request an independent bill review within 30 calendar days of service of the second review pursuant to Section 4603.2 or 4622. If the provider fails to request an independent bill review within 30 days, the bill shall be deemed satisfied, and neither the employer nor the employee shall be liable for any further *payment*. If the employer has contested liability for any issue other than the reasonable amount payable for services, that issue shall be resolved prior to filing a request for independent bill review, and the time limit for requesting independent bill review shall not begin to run until the resolution of that issue becomes final, except as provided for in Section 4622.

"(b) A request for independent review shall be made on a form prescribed by the administrative director, and shall include copies of the original billing itemization, any supporting documents that were furnished with the original billing, the explanation of review, the request for second review together with any supporting documentation submitted with that request, and the final explanation of the second review. The administrative director may require that requests for independent bill review be submitted electronically. A copy of the request, together with all required documents, shall be served on the employer. Only the request form and the proof of payment of the fee required by subdivision (c) shall be filed with the administrative director. Upon notice of assignment of the independent bill reviewer, the requesting party shall submit the documents listed in this subdivision to the independent bill reviewer within 10 days.

"(c) The provider shall pay to the administrative director a fee determined by the administrative director to cover no more than the reasonable estimated cost of independent bill review and administration of the independent bill review program. The administrative director may prescribe different fees depending on the number of items in the bill or other criteria determined by regulation adopted by the administrative director. If any additional payment is

15

found owing from the employer to the medical provider, the employer shall reimburse the provider for the fee in addition to the amount found owing.

"(d) Upon receipt of a request for independent bill review and the required fee, the administrative director or the administrative director's designee shall assign the request to an independent bill reviewer within 30 days and notify the medical provider and employer of the independent reviewer assigned.

"(e) The independent bill reviewer shall review the materials submitted by the parties and make a written determination of any additional amounts to be paid to the medical provider and state the reasons for the determination.  If the independent bill reviewer deems necessary, the independent bill reviewer may request additional documents from the medical provider or employer.  The employer shall have no obligation to serve medical reports on the provider unless the reports are requested by the independent bill reviewer.  If additional documents are requested, the parties shall respond with the documents requested within 30 days and shall provide the other party with copies of any documents submitted to the independent reviewer, and the independent reviewer shall make a written determination of any additional amounts to be paid to the medical provider and state the reasons for the determination within 60 days of the receipt of the administrative director's assignment. The written determination of the independent bill reviewer shall be sent to the administrative director and provided to both the medical provider and the employer.

"(f) The determination of the independent bill reviewer shall be deemed a determination and order of the administrative director. The determination is final and binding on all parties unless an aggrieved party files with the appeals board a verified appeal from the medical bill review determination of the administrative director within 20 days of the service of the determination.  The medical bill review determination of the administrative director shall be presumed to be correct and shall be set aside only upon clear and convincing evidence of one or more of the following grounds for appeal:

16

"(1) The administrative director acted without or in excess of his or her powers.

"(2) The determination of the administrative director was procured by fraud.

"(3) The independent bill reviewer was subject to a material conflict of interest that is in violation of Section 139.5.

"(4) The determination was the result of bias on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability.

"(5) The determination was the result of a plainly erroneous express or implied finding of fact, provided that the mistake of fact is a matter of ordinary knowledge based on the information submitted for review and not a matter that is subject to expert opinion.

"(g) If the determination of the administrative director is reversed, the dispute shall be remanded to the administrative director to submit the dispute to independent bill review by a different independent review organization.  In the event that a different independent bill review organization is not available after remand, the administrative director shall submit the dispute to the original bill review organization for review by a different reviewer within the organization.  In no event shall the appeals board or any higher court make a determination of ultimate fact contrary to the determination of the bill review organization.

"(h) Once the independent bill reviewer has made a determination regarding additional amounts to be paid to the medical provider, the employer shall pay the additional amounts per the timely payment requirements set forth in Sections 4603.2 and 4603.4."  (S.B. 863, § 39; Lab. Code, § 4603.6.)

In addition to these provisions, S.B. 863 also added sections 139.5, 4603.3, and 4903.5, and amended section 4622, all of which relate to the newly created administrative IBR.[11]

According to petitioners, the Legislature made this new IBR system applicable to pending billing disputes between employers and medical providers by way of a non-codified provision in S.B. 863. The petitioners point to section 84 of S.B. 863 which states, "This act shall apply to all pending matters, regardless of date of injury, unless otherwise specified in this act, but shall not be a basis to rescind, alter, amend, or reopen any final award of workers' compensation benefits."[12] The petitioners argue that since S.B. 863 does not elsewhere specify that the IBR procedure applies only to future billing disputes, the IBR procedure set forth in the statute must apply to "all pending matters."

Looking solely at section 84 of S.B. 863, petitioners' argument that the Legislature intended to immediately divest the WCAB of jurisdiction over medical billing disputes might appear to be correct. However, further review of S.B. 863, as well as a review of the entire framework of the newly created IBR procedure, demonstrates that the legislative picture is not nearly as straightforward as petitioners maintain.

---

[11]    To the extent that these provisions are relevant to our discussion, we will provide the relevant language at that point in the discussion.

[12]    Although uncodified, this provision is nevertheless fully a part of the statutory law. (See *County of Los Angeles v. Payne* (1937) 8 Cal.2d 563, 574.)

18

"Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.] ' " 'Words must be construed in context, and statutes must be harmonized, *both internally and with each other*, to the extent possible.' [Citation.] Interpretations that lead to absurd results or render words surplusage are to be avoided." ' " (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037 (*Tuolumne Jobs*), italics added.)

"[W]here a statute's terms are unclear or ambiguous, we may 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*In re M.M.* (2012) 54 Cal.4th 530, 536.) "Moreover, ' "[every] statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." ' " (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 610; *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 903 [" 'Statutory language should not be interpreted in isolation, but must be construed in the context of the entire statute of which it is a part, in order to achieve harmony among the parts' "].)

After considering S.B. 863 as a whole, we conclude that this legislation is ambiguous with respect to whether the IBR process was intended to apply to pending billing disputes, or, rather, was intended to apply only prospectively, to new billing disputes that arise with respect to injuries that occur after the effective date of the

19

legislation. Attempting to apply section 84 of S.B. 863 in this case would leave these parties without a process by which to have their dispute resolved by a third party, since the new IBR process may be utilized only if certain conditions precedent have been met, and the deadlines for meeting those conditions have passed. Leaving these parties without a viable process to decide their dispute cannot be what the Legislature intended. We conclude that in creating the IBR process, the Legislature intended to establish a new dispute resolution procedure that would apply to disputes arising on or after the effective date of the legislation, and not to disputes like this one that were pending at the time the legislation went into effect.

Although petitioners suggest that we look only to section 84 of S.B. 863 to conclude that the Legislature intended that the new IBR procedure applies to pending billing disputes, section 84 provides for application of the provisions of S.B. 863 to "pending matters . . . *unless otherwise specified in this act*" (Stats, 2012, ch. 363, § 84). S.B. 863, section 7 also added Labor Code section 139.5, a provision that authorizes the administrative director of the DWC (administrative director) to make contracts with organizations that can provide reviewers to implement the newly created IBR and IMR systems. Section 139.5 provides in relevant part:

> "(a) (1) The administrative director shall contract with one or more independent medical review organizations and one or more independent bill review organizations to conduct reviews pursuant to Article 2 (commencing with Section 4600) of Chapter 2 of Part 2 of Division 4. . . .

20

"(2) ***To enable the independent review program to go into effect for injuries occurring on or after January 1, 2013***, *and until the administrative director establishes contracts as otherwise specified by this section, independent review organizations under contract with the Department of Managed Health Care pursuant to Section 1374.32 of the Health and Safety Code may be designated by the administrative director to conduct reviews pursuant to Article 2 (commencing with Section 4600) of Chapter 2 of Part 2 of Division 4*.  The administrative director may use an interagency agreement to implement the independent review process beginning January 1, 2013.  The administrative director may initially contract directly with the same organizations that are under contract with the Department of Managed Health Care on substantially the same terms without competitive bidding until January 1, 2015."  (§ 139.5, subd. (a), italics and boldface added.)

Although this provision does not expressly state that the Legislature intended that the IBR and IMR processes go into effect only prospectively, it provides an indication that the Legislature viewed both the IMR *and* IBR processes as applying to *future* employment-related injuries and to *future* disputes as to medical care and billing for such care.

Petitioners and amicus curiae California Workers' Compensation Institute suggest that the relevant language in section 139.5, subdivision (b) exists only to permit the administrative director to contract with *IMR* providers in order to meet the approaching implementation date set forth for the *IMR* procedure as directed in section 4610.5. However, subdivision (a) of section 139.5 requires the administrative director to contract with "one or more independent medical review organizations *and one or more independent bill review organizations* to conduct *reviews* pursuant to Article 2 (commencing with Section 4600) of Chapter 2 of Part 2 of Division 4."  (§ 139.5, subd.

21

(a)(1), italics added.) It is therefore clear that the "independent review program" (§ 139.5, subd. (a)(2)) referred to in section 139.5, subdivision (b) includes both the medical review process *and* the bill review process. Further, the language of subdivision (a) suggests that the Legislature anticipated that the contracts referred to in the subdivision would have to exist *before* the review procedure could go into effect. Section 139.5 thus suggests that the Legislature intended that both the IMR and IBR processes be implemented only prospectively, and that they were not intended to apply to pending claims.

This conflict between the language of section 84 of S.B. 863 (i.e., "This act shall apply to all pending matters, regardless of date of injury . . . ") and the reference to "enabl[ing] the independent review program to go into effect for injuries occurring on or after January 1, 2013" in section 139.5, subdivision (a)(2) renders the legislation ambiguous with respect to whether it was intended to apply to pending billing disputes such as the one at issue here, or rather, whether it was intended to apply only to disputes that arose with respect to injuries that occur after the effective date of the legislation, i.e., January 1, 2013.[13]

---

13    Section 84 of S.B. 863 appears to be a "catch-all" provision, intended to assist in the implementation of a number of changes that were made to the workers' compensation law in S.B. 863. Again, S.B. 863 made significant changes to a number of different areas of workers' compensation law, and did not address solely the process by which resolution of medical treatment disagreements and billing disagreements shall occur. Among other things, S.B. 863 increases permanent disability values, alters/simplifies the permanent disability rating method, simplifies the supplemental job displacement voucher system, requires a fee for the filing of a lien, makes changes to the creation and maintenance of

22

In the face of such ambiguity, we are led to interpret the statute as operating prospectively. (See *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 230 [statutes ordinarily are interpreted as operating prospectively in the absence of a clear indication of a contrary legislative intent]; see also *Myers v. Philip Morris Companies, Inc*. (2002) 28 Cal.4th 828, 841 [when a statute is ambiguous regarding retroactivity, it is construed to be prospective in application].) In construing statutes, there is a presumption against retroactive application unless the Legislature plainly has directed otherwise by means of " 'express language of retroactivity or . . . other sources [that] provide a clear and unavoidable implication that the Legislature intended retroactive application.' " (*McClung v. Employment Development Dept*. (2004) 34 Cal.4th 467, 475 (*McClung*), italics omitted.) Although, at first blush, S.B. 863 section 84 might appear to constitute " 'express language of retroactivity' " (*McClung*, *supra*, at p. 475), it specifically allows for other portions of the statute to provide a different rule regarding retroactive/prospective application, and at least one other provision of the statute, Labor Code section 139.5, suggests that the IBR process was intended to apply only to disputes over medical treatment provided for injuries that occur on or after January 1, 2013.

---

medical provider networks, updates the OMFS, establishes a fee schedule for various other services, including interpreters, vocational experts, and in-home health care, and provides for additional payments to be made to workers who suffer disproportionate wage loss.

The new process by which billing disputes are to be resolved provides an even more compelling basis for our conclusion that the Legislature intended the IBR process to apply only to new disputes over billing. Specifically, S.B. 863 sets forth a number of conditions precedent that *must* be met, as well as strict time limits within which those conditions must be met, *before* a provider may seek access to the IBR process to resolve a billing dispute.

For example, after a medical provider submits a bill to an employer, the employer is to either pay the bill with an explanation of review or notify the provider of any objection to the bill (based on a contesting of the amount, denial of the bill, or an objection that the itemization is incomplete). (§ 4603.2, subd. (b)(1).) Specifically, within 45 days of receiving the bill, an employer must provide any payment to the provider, along with "an explanation of review pursuant to Section 4603.3," and if the employer considers the bill, or any portion of it to be "contested, denied, or considered incomplete," the employer must notify the provider in the "explanation of review" of the "items being contested, the reasons for contesting these items, and the remedies available to the physician or the other provider if he or she disagrees" within 30 days of receipt of the bill. (§ 4603.2, subd. (b)(2) & (b)(2)(B).)

Section 4603.3, as newly adopted pursuant to S.B. 863, section 37, sets forth what an employer must include in its "explanation of review" when it pays, adjusts, or denies a "complete or incomplete itemization of medical services." (§ 4603.3.) Although the provision sets forth certain basic information that must be provided, it also states that

24

employers must provide an explanation of review "in the manner prescribed by the administrative director."[14] (*Ibid.*)

If the employer fails to meet these statutory requirements regarding the explanation of review, the employer must pay "[a]ny properly documented list of services provided" at the "rates then in effect under Section 5307.1 . . . and increased by 15

_____

[14]    Section 4603.3, which was added by S.B. 863, section 37, provides in relevant part:

> "(a) Upon payment, adjustment, or denial of a complete or incomplete itemization of medical services, *an employer shall provide an explanation of review* in the manner prescribed by the administrative director that shall include all of the following:

> "(1) A statement of the items or procedures billed and the amounts requested by the provider to be paid.

> "(2) The amount paid.

> "(3) The basis for any adjustment, change, or denial of the item or procedure billed.

> "(4) The additional information required to make a decision for an incomplete itemization.

> "(5) If a denial of payment is for some reason other than a fee dispute, the reason for the denial.

> "(6) Information on whom to contact on behalf of the employer if a dispute arises over the payment of the billing.  The explanation of review shall inform the medical provider of the time limit to raise any objection regarding the items or procedures paid or disputed and how to obtain an independent review of the medical bill pursuant to Section 4603.6."  (Italics added.)

percent, together with interest at the same rate as judgments in civil actions retroactive to the date of receipt of the itemization . . . ."  (§ 4603.2, subd. (b)(2).)

S.B. 863 also adds another level of review that a provider may request if the provider disagrees with the amount of payment remitted by an employer after the first review of the bill.  (§ 4603.2, subd. (e).)  This second review, *which is required prior to initiation of the IBR process*, must be requested by the provider *within 90 days after receipt of the explanation of review* from the employer as to why the full amount of the bill was not paid.  (§ 4603.2, subd. (e)(1).)  If the only dispute between the provider and the employer is the amount of the payment, and the provider fails to request a second review within 90 days, the bill is automatically deemed satisfied, and no further payment will be required.  (§ 4603.2, subd. (e)(2).)

Within 14 days after receipt of the request for second review, the employer must issue a final written determination on the bill, and any amount not in dispute between the provider and the claims administrator must be paid within 21 days after receipt of the request for a second review.  (§ 4603.2, subd. (e)(3).)  If, however, the provider still disagrees with the decision of the employer after the second review, the provider may request the IBR process.  This request must be made on a form designated by the administrative director, and *must be filed with the DWC within 30 days after receipt of the second review decision*.  (§ 4603.6.)  Only then may the request be assigned to an independent bill reviewer.

26

As is clear from this framework, all of the relevant deadlines for the new requirements enacted by S.B. 863 begin to run as of the date the employer receives the provider's initial bill. All of the relevant deadlines that the parties to a billing dispute must meet in order to be eligible to invoke the IBR process have long since passed in this matter, years before S.B. 863 was passed by the Legislature. As a result, neither party has satisfied the requirements imposed on it by the new procedure. The Legislature made all of these events *conditions precedent* to the availability of the IBR process, and *did not provide for an expedited or alternative procedure for disputed bills that were pending at the time S.B. 863 was enacted*.

Further, under the new system, an employer's failure to respond to a provider's bill as required under the statute would mean that the employer would have to pay for the services at the "rates then in effect under section 5307.1 . . . and increased by 15 percent, together with interest at the same rate as judgments in civil actions retroactive to the date of receipt of the itemization." However, as is made clear by this case, there were no relevant rates "then in effect" under section 5307.1 (a section that currently consists of the OMFS), since there was no OMFS for ASCs during the relevant time period.

The practical effect of attempting to apply the new IBR review process to pending disputes, such as the one at issue in this case, would be that the parties would be left with *no dispute resolution process at all*. These parties would not be able to access the IBR process because they have met none of the prerequisites, and it would not be possible for them to meet them at this point in time; there would be no resolution by default because

27

there were no rates "then in effect" under section 5307.1; and the parties would not have available to them the option of litigation before the Board to resolve their dispute.

Considering these obstacles to applying the new billing review process to pending claims, it is clear that the Legislature could not have intended to leave parties who had pending billing disputes on the effective date of the new statutory scheme *with no meaningful procedure for resolving their disputes*.

Petitioners maintain that application of the new IBR procedure to pending claims would not be "impossible." According to petitioners, since its amendment in 2001, section 4603.2 has required an "explanation of review" if an employer uses a bill review service. Thus, petitioners argue, "[t]he only thing needed to properly implement the new IBR procedure consistent with the Legislature's mandate is for the administrative director to simply promulgate regulations establishing a procedure for second bill review for any unresolved provider bill for a date of service before January 1, 2013 where the employer had previous provided the medical provider with an objection pursuant to the previous requirements of section 4603.2 . . . ." Petitioners claim that "[s]uch regulations, consistent with [S.B.] 863's intent, or those that are reasonabl[y] necessary to effectuate the purpose of the statutes, are permissible

In making this argument, petitioners essentially concede that there is currently n*o viable process* by which Elite may obtain an IBR for the claims that have been pending for years, without someone else stepping up to create such a process. According to petitioners, this person should be the administrative director. We are not convinced that

the administrative director's "broad discretion to adopt rules and regulations as necessary to promote the public welfare" (*Calfarm Ins. Co. v. Deukmajian* (1989) 48 Cal.3d 805, 824) is so broad as to permit the administrative director to do what petitioners suggest. Any regulation adopted by the administrative director must be " 'within the scope of the authority conferred' [citation] and . . . reasonably necessary to effectuate the purpose of the statute.' " (*Bearden v. U.S. Borax, Inc*. (2006) 138 Cal.App.4th 429, 436.)  Although S.B. 863 authorizes the administrative director to promulgate many regulations in order *to implement the new review process created by the Legislature*, it does not authorize the administrative director to develop a separate, parallel process that would apply to billing disputes that were pending between employers and medical providers on the effective date of the legislation.

The administrative director's adopted regulations implementing the review processes for medical treatment and billing indicate that the administrative director has interpreted S.B. 863's creation of the IMR and IBR processes as applying only to *new* disputes (both medical and billing) over care provided to employees as a result of a employment-related injuries, and not to disputes that were pending when S.B. 863 was enacted.[15]  For example, the administrative director adopted 8 California Code of

---

15    As stated above, although the interpretation of a labor statute is a legal question subject to independent review, we "generally defer to the [Board's] interpretation of labor statutes unless clearly erroneous." (*City of Long Beach v. Workers' Comp. Appeals Bd., supra,* 126 Cal.App.4th at p. 316, fn. 5.)

Regulations section 9792.5.5 in order to implement the second review process created by the Legislature in S.B. 863. That regulation provides in pertinent part:

> "(a) If the provider disputes the amount of payment made by the claims administrator on a bill *for medical treatment services rendered on or after January 1, 2013*, submitted pursuant to Labor Code section 4603.2, or Labor Code section 4603.4, or bill *for medical-legal expenses incurred on or after January 1, 2013*, submitted pursuant to Labor Code section 4622, the provider may request the claims administrator to conduct a second review of the bill.
>
> "(b) The second review must be requested within 90 days of:
>
> "(1) The date of service of the explanation of review provided by a claims administrator in conjunction with the payment, adjustment, or denial of the initially submitted bill, if a proof of service accompanies the explanation of review.
>
> "(A) The date of receipt of the explanation of review by the provider is deemed the date of service, if a proof of service does not accompany the explanation of review and the claims administrator has documentation of receipt.
>
> "(B) If the explanation of review is sent by mail and if in the absence of a proof of service or documentation of receipt, the date of service is deemed to be five (5) calendar days after the date of the United States postmark stamped on the envelope in which the explanation of review was mailed.
>
> "(2) The date of service of an order of the Workers' Compensation Appeal Board resolving any threshold issue that would preclude a provider's right to receive compensation for the submitted bill."
> (8 Cal. Code Regs., § 9792.5.5, italics added.)

The regulation goes on to specify the forms to be used—forms created by the administrative director after the enactment of S.B. 863, and the information to be

30

included in the request. The next section provides a visual copy of the form. (8 Cal.

Code Regs., §§ 9792.5.5, subds. (c), (d); 9792.5.6.)

In 8 California Code of Regulations section 9792.5.7, the administrative director

sets out the process by which a provider may request the IBR process under the new law:

> "If the provider further contests the amount of payment made by the
> claims administrator o*n a bill for medical treatment services or
> goods rendered on or after January 1, 2013,* submitted pursuant to
> Labor Code sections 4603.2 or 4603.4, or bill for medical-legal
> expenses incurred on or after January 1, 2013, submitted pursuant to
> Labor Code section 4622, following the second review conducted
> under section 9792.5.5, the provider shall request an independent bill
> review. . . ." (8 Cal. Code Regs., § 9792.5.7, subd. (a), italics
> added.)

It is clear from these regulations that the administrative director has interpreted

S.B. 863, and specifically, the new IBR process, as applying only prospectively—i.e., to

disputes that arise *after enactment of the new IBR process*, and not to pending disputes.[16]

We acknowledge that the Legislature was far less ambiguous with respect to the

prospective application of the newly created IMR process created by S.B. 863.

Specifically, section 4610.5, enacted by S.B. 863, section 45, explains that the new *IMR*

---

[16]  The administrative director has interpreted the statute as applying to disputes over
bills *for services rendered after January 1, 2013*.  The portion of the legislation that
suggests the relevant date for purposes of the new IBR process, i.e., section 139.5, which
authorizes the administrative director to contract with the entities that will be used to
conduct the IBR process, refers to the "program . . . go[ing] into effect f*or injuries
occurring on or after January 1, 2013*." (§ 139.5, subd. (a)(2), italics added.)  We need
not determine whether the triggering event for purposes of application of the new IBR
process to a dispute is whether the relevant employment-related injury occurred on or
after January 1, 2013, or, rather, whether the service provided to an employee for which
the bill is in dispute occurred on or after January 1, 2013, since the injuries and services
at issue in this case all occurred many years prior to January 1, 2013.

31

process applies to "[a]ny dispute over a utilization review decision regarding treatment *for an injury occurring on or after January 1, 2013*" (§ 4610.5, subd. (a)(1), and/or "[a]ny dispute over a utilization review decision if the decision i*s communicated to the requesting physician on or after July 1, 2013, regardless of the date of injury*." (§ 4610.5, subd. (a)(2), italics added.) Although S.B. 863 includes no similar language with respect to the IBR process, section 139.5, subdivision (a)(2), which discusses the need for the administrative director "[t]o enable the independent review program to go into effect for injuries occurring on or after January 1, 2013," refers to the need for *both* the IMR and IBR processes to go "into effect for injuries occurring on or after January 1, 2013." (*Ibid.*) Given the language of section 139.5, subdivision (b), the fact that the Legislature was clearer regarding the prospective application of the IMR process than it was with respect to the IBR process does not, in our view, undermine our conclusion that S.B. 863 is ambiguous as to whether it intended to treat the IBR process differently with respect to pending claims. Rather, this fact simply further demonstrates that S.B. 863 does not provide clear guidance as to the Legislature's intention concerning retroactive versus prospective application.

Our examination of the objectives to be achieved by the legislation, public policy, and the statutory scheme together[17] leads us to conclude that S.B. 863 does not divest the

---

17    We recognize that we have made no mention of the legislative history of S.B. 863 in our discussion of this matter. Neither the parties nor amici curiae referred to the legislative history in setting forth their arguments. Our independent review of the legislative history has revealed nothing that would provide insight into the Legislature's

Board of jurisdiction over pending billing disputes, thereby requiring that ongoing litigation involving such disputes be abandoned.[18] We therefore reject petitioners' contention that S.B. 863 divests the Board of jurisdiction over the billing disputes at issue in this matter.

C. *Substantial evidence supports the Board's conclusions as to what a reasonable outpatient facility fee is for the relevant procedures during the relevant time period*

The petitioners contend that even if the Board retains jurisdiction to resolve Elite's consolidated lien claims, the Board's three findings of fact (determined in the first instance by the WCJ and subsequently adopted by the Board en banc) are not supported by substantial evidence. Specifically, the petitioners argue that there is insufficient evidence to support the Board's determination that the reasonable facility fees for arthroscopic knee procedures, arthroscopic shoulder procedures, and epidural injection procedures were $5,207.85, $4,340.95, and $2,337.52, respectively.

---

intention with respect to the issue raised by petitioners. Although there was much discussion of the *IMR* process in various committee reports and other contemporaneous records, there was little discussion of the *IBR* process, and there is nothing mentioned regarding the Legislature's intention with respect to whether the new IBR process was to apply to pending billing disputes or only to future billing disputes.

[18] In fact, all of the deadlines for the conditions precedent to obtaining IBR have passed, and those conditions precedent have not been met, so IBR would not be possible under the current statutory schedule. There is nothing in the legislation that would indicate that the conditions precedent may be dispensed with as to pending disputes, nor is there any legislative direction as to how the IBR process could go forward without those conditions having been met. Thus, as a practical matter, under the process created by S.B. 863, IBR would not be available to these parties at this point in time.

An outpatient surgery center has the affirmative burden of proving that its lien is reasonable, and it must carry this burden by a preponderance of the evidence. (*Tapia v. Skill Master Staffing et al.* (2008) 73 Cal.Comp.Cases 1338, 1342-1343 (*Tapia*), quoting § 5705 [" '[t]he burden of proof rests upon the party or lien claimant holding the affirmative of the issue' "] and § 3202.5 [" '[a]ll parties and lien claimants shall meet the evidentiary burden of proof on all issues by a preponderance of the evidence' " (italics omitted)].)

When parties fail to agree on what constitutes the reasonable outpatient facility fee for a particular service, the Board may take into consideration a wide array of factors, including but not limited to, the amount the provider usually charges for that service, what the provider usually accepts as full payment for the service, the usual fee of other providers in the geographical area in which the services were rendered, what other providers in the same geographical area usually accept as payment for the same or similar services, and what inpatient hospitals or surgery centers in the same geographical area charge and ultimately accept for the same or similar services. (See *Tapia, supra,* 73 Cal.Comp.Cases at pp. 1343-1344.) In considering these factors, the Board will not find a particular billing for a service by an ASC to be "reasonable" if the charge is " '*grossly disproportionate*' " to the amount accepted by other outpatient and inpatient facilities in the same geographical area for the same or similar services. (*Id*. at p. 1344, italics added, quoting *Kunz v. Patterson Floor Coverings, Inc.* (2002) 67 Cal.Comp.Cases 1588, 1599 (*Kunz*).)

34

The factors discussed in *Tapia* do not constitute an exhaustive list of the evidence that the Board may consider when determining the reasonableness of a fee for a service. Rather, "in litigating the question of a reasonable outpatient surgery center fee, a defendant or lien claimant may present *any relevant evidence concerning that issue*." (*Tapia*, *supra*, 73 Cal.Comp.Cases at p. 1344, italics added.) In fact, in *Tapia*, the Board considered evidence beyond just the billing and accepted rates for services. In addition to this evidence, the Board considered what the inpatient OMFS allowed during the relevant time period, what the Medicare fee schedule allowed, and what the outpatient OMFS allowed, despite the fact that the outpatient OMFS applied to dates of service that were not applicable to the claim at issue. (*Ibid*.) The Board was clear in stating that "neither section 5307.1, [subdivision] (c) nor the OMFS [for ASCs], standing alone, is dispositive of the issue of what constitutes a reasonable fee for outpatient surgery center services before January 1, 2004." (*Tapia*, *supra*, at p. 1346.) The Board may also consider "other aspects of the economics of the medical provider's practice that are relevant, and any unusual circumstances in the case." (*Kunz, supra,* 67 Cal.Comp.Cases at p. 1598.)

Petitioners' contention that, with respect to the liens at issue before the Board "the relevant evidence is limited to what Elite's 'similarly situated' competitor ASCs in [the] San Diego County 'market place' charged and accepted for the same services" is simply incorrect. Under *Tapia*, on which petitioners, themselves, rely, it is clear that the "relevant evidence" that a party may present in support of a claim for fees "is *not* limited to the fees accepted by other outpatient surgery centers in the same geographic area for

35

the services provided." (*Tapia*, *supra*, 73 Cal.Comp.Cases at p. 1340, italics added.)

Rather, "*any evidence* relevant to reasonableness may be offered to support or rebut the lien." (*Ibid.*, italics added.)

In this case, the parties presented abundant evidence to the WCJ, and the record demonstrates that the WCJ considered that evidence, weighed it, and ultimately reached a conclusion as to the "reasonable facility fee." In reaching this conclusion, the WCJ did not adopt, in full, the position of either side in this matter.

The WCJ noted that, at the far and disparate ends of the spectrum of fees for the relevant procedures, a "reasonable facility fee" should not be "less than what Medicare would allow, and not more than what Elite contends it has collected on average over the years for the various types of facility fees." The WCJ had evidence before him as to the fee schedule that Medicare would allow for these procedures, as well as evidence as to the average amount that Elite collected on its bills for the same or similar procedures between 2000 and 2003.

In narrowing the range between these disparate figures, the WCJ considered the amounts that other ASCs billed and accepted, as well as the OMFS for hospitals that was in effect between April 13, 2001 and December 31, 2003. Beyond this evidence, the WCJ considered the OMFS for ASCs that went into effect as of January 1, 2004.

The WCJ also considered evidence regarding the nature of Elite's facilities. One witness, an administrator of a San Diego outpatient surgical center not affiliated with Elite, testified that the facility at which she worked "was not set up to do the range of

36

services available at the Elite facilities." In order to provide those services, including epidural lysis procedures and spinal surgeries, larger operating rooms and more expensive medical equipment would have been required. In addition, arthroscopic knee and shoulder surgeries did not present a "significant percentage of the income" at her facility in 2003, and unlike the facility where the witness worked, Elite was equipped to perform spinal surgeries. Further, Elite required that all epidural procedures be done in an operating room, using IV sedation, as well as fluoroscopies and epidurograms. The witness's facility did not perform epidural lysis procedures, but instead allowed physicians to perform " 'blind stick' epidural injections, i.e. without fluoroscopy or epidurogram." Elite also utilized state-of-the-art surgical equipment and was therefore prepared to perform procedures that other ASC's were not equipped to perform. The witness testified that if an expensive piece of equipment was needed for a particular procedure for a patient at the facility where she worked, she would try to convince the treating physician to perform the procedure at a hospital, instead. These facts go to the "economics of the medical provider's practice" and may be considered "unusual circumstances" in the case that support the WCJ's conclusion that the "reasonable" fee for the services at issue for the Elite facilities might be different from, and higher than, the "reasonable" fee for those services at other local ASCs during the relevant time period. (*Kunz, supra,* 67 Cal.Comp.Cases at p. 1598.)[19]

_____

[19]    Although the creation of an OMFS for ASCs in 2004 eliminated any distinctions

The WCJ ultimately concluded that a "reasonable" facility fee for Elite to be paid

for the three challenged procedures would fall *between* the OMFS established for ASCs

as of January 1, 2004, and the OMFS established for inpatient hospital facilities during

the relevant time period.  For example, the OMFS for hospital facilities during between

April 13, 2001 to December 31, 2003 (i.e., most of the relevant time period) allowed for

an average payment of $3,859.55 for percutaneous lysis of epidural adhesions, an average

payment of  $8,490.18 for arthroscopic knee procedures, and an average payment of

$5,652.43 for arthroscopic shoulder procedures.  On the other hand, the OMFS that went

into effect for ASCs as of January 1, 2004, allowed for an average payment of $815.50

for percutaneous lysis of epidural adhesions, an average payment of $1,952.52 for

arthroscopic knee procedures, and an average payment of $3,029.48 for arthroscopic

shoulder procedures.  The WCJ concluded that the "reasonable" facility fees with respect

to Elite's liens were (1) $2,337.52 for percutaneous lysis of epidural adhesions, (2)

$5,207.85 for arthroscopic knee procedures, and (3) $4,340.95 for arthroscopic shoulder

procedures, all of which represent the average between the allowance for these

procedures under the OMFS for hospitals between April 2001 and December 2003 and

the allowance for these procedures under the OMFS for ASCs in place as of January

2004.

in payment as between local ASCs, during the relevant time period no such OMFS was in place.  Given the absence of a standardized fee schedule for these procedures, it was up to the WCJ to determine what a "reasonable facility fee" was for these procedures.  In doing so, the WCJ was clearly not required to select any particular point of evidence as determinative of what "reasonable" meant in the context of this dispute.

38

As the WCJ noted, the formula that he used to calculate the "reasonable" facility fees for the relevant time period for the procedures at issue took into consideration what Medicare allowed, what Elite charged, what Elite accepted as payment, what the OMFS for ASCs as of January 1, 2004 allowed, what the OMFS for hospitals during much of the relevant period allowed, *and* the fees that other ASCs billed and accepted for the same or similar services. The WCJ considered evidence as to all of these factors, and arrived at results that fell somewhere in the middle of all of these figures. These conclusions are supported by the evidence and are clearly permissible. (See *San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 931 [ultimately, the trier of fact " 'may accept the evidence of any one expert or choose a figure between them based on all of the evidence' "].)

## IV.

## DISPOSITION

The decision of the Board after reconsideration is affirmed. The parties are to bear their own costs in this proceeding.

 

                                                                   AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.